ELIZABETH WHITRIDGE, by her next friend, JAMES H.
B. WHITRIDGE *vs.* WILLIAM H. WHITRIDGE, WIL-
LIAM A. MOALE, and others.

*Deed of Settlement—Confidential relation—Competency of
Witness—Admissibility of Evidence under sec. 2 of Art. 5
of the Code—Undue influence—Laches and Acquiescence.*

A deed without consideration was executed by the grantor within
six months after she had reached the age of twenty-one years, by
which she conveyed to her father and a cousin, all the property
of every kind to which she was entitled, under her grandfather's
will, in trust for her sole and separate use for life, remainder
to her issue living at her death, remainder in equal moieties,
but unequal estates, to her father and brother—to her father
absolutely, and to her brother for life—with cross-remainders
and alternate remainders to the heirs-at-law and next-of-kin

of her grandfather. A power was superadded to prefer and apportion among those heirs-at-law and next-of-kin by last will and testament; and the right to dispose by will of $150,000 of the settled property to whomsoever she pleased, was reserved to her by the deed. The deed contained no power of revocation. HELD :

That the gift to the father was *prima facie* void, and he being dead and his co-trustee having retired from the trust, and other trustees having been appointed in their stead, the burden was upon the new trustees to show that it was the free, voluntary, and unbiased act of the settlor.

The father, one of the parties to the deed, being dead, the grantor is a competent witness, being called by the new trustees, the real defendants in the cause, and her testimony is admissible under section 2 of Article 5 of the Code, which provides that where a party to a contract or cause of action is dead, the living party may be examined if called by the opposite party to the cause.

The grantor testified that she was told by her grandfather's adviser, who had drawn his will, and was one of the trustees thereunder, that it was obligatory that she should put her share of the property in trust; that it was her grandfather's wish; and that the reason why he had not put her share in trust himself was to give her "father the courtesy to elect to put it in trust or not." She was thus led to believe from these, and from similar statements frequently made by her grandmother and her uncle, that her interest in her grandfather's estate was, in accordance with his wishes, to be placed by her in trust, if her father so elected, when she attained the age of twenty-one years. Her father also said it ought to be put in trust. She eventually became engaged to be married, and after further pressure, and with the alternative given her of signing the deed, or of being denied her father's approval of her marriage, she signed the deed without having read it, merely skimming over it and not understanding its meaning. It was explained to her by no one; and its results were not pointed out to her. HELD :

That apart from the unequivocal testimony of the settlor, the deed furnished strong intrinsic evidence, in reserving no power of revocation and in surrendering all testamentary power over the bulk of the estate, save the right to appoint among persons of a designated and selected class, that she did not understand its provisions, and that it was not her free, voluntary, and unbiased act.

The fact that the grantor within a few months after her marriage. in having her will drawn, submitted the deed to an eminent lawyer and asked his opinion as to its validity, and was informed that, while unusual in its provisions, it was not open to impeachment, and that some years later she was informed by her father that he, too, had sought an opinion as to its validity, and with the like result, and that within a few weeks after she had learned from her solicitors to whom the deed and the circumstances attending its execution were submitted, that it was open to assault in a Court of equity, she filed her bill to have it cancelled, exempts her from being chargeable with laches and acquiescence.

APPEAL from the Circuit Court of Baltimore City.

The following opinion was delivered by Judge PHELPS in the Court below:

The object of this suit is the cancellation of a deed of trust executed by the plaintiff 9th November, 1876. The case has been twice argued, the first time before Judge DENNIS, who declined to entertain it as then presented, for reasons which will appear further on.

The plaintiff is the daughter of the late William H. Graham, and the grand-daughter of the late George Brown. Upon her coming of age in March, 1876, she became entitled in her own right to the possession of one-fourteenth' of her grandfather's estate under his will, her share with its accumulations then amounting to $357,920.94. She had also expectations from her grandmother, Mrs. Isabella Brown, her father and other relations, which have been since realized.

The case made by the bill, filed 18th June, 1890, is that her intended marriage to her present husband, William H. Whitridge, being opposed by her father, her grandmother, and the family generally, every effort was made by them to break off the match, and to that end they all combined to compel her to execute a deed of trust of her property, which, should she die without issue, would secure it all to the Brown family and ex-

clude her husband from its administration, and the execution whereof by her they believed would cause the defendant, William H. Whitridge, to break off said marriage. The deed, she charges, was obtained from her by the influence of her father and grandmother, at a time and under circumstances when her mind was incapable of exercising any free agency, and was too feeble to resist their influence.

The grantees and trustees named in the deed are the plaintiff's father, the late Wm. H. Graham, and Wm. G. Bowdoin. The general scheme of the deed, (leaving out of view the powers to devise,) is a voluntary settlement of that portion of the grantor's fortune coming to her under her grandfather's will, in trust for the separate use of the grantor for life, remainder to her issue living at her death, remainder in equal moieties (but unequal estates) to her father and brother, with cross-remainders, ultimate remainder to the heirs-at-law and next-of-kin of her said grandfather. The powers to devise are:

1st. As to $150,000 absolutely.

2nd. To prefer and apportion at her pleasure as amongst her "issue."

3rd. To prefer and apportion at her pleasure as amongst the "descendants" of her grandfather.

This last power can only be made available in remote contingencies. Upon the termination of her life estate two main contingencies are provided for, the contingency of her death leaving issue then living, and the contingency of her death without issue then living. The first of these contingencies is subdivided into two; the first supposing the powers to devise to have been exercised in whole or in part; the second providing for so much as may not have been so devised. In this way three principal contingencies are developed, and provision is then made for eight sub-contingencies or "cases," under each of these three heads; four of these "cases" being appli-

cable to the moiety of her father and four of them to the moiety of her brother. These twenty-four sub-contingencies or "cases" are of course postulated upon the various contingencies of life and death of her successors, and of death with and death without issue, and whether before or after the several events upon which the contingent remainders and cross-remainders are limited.

The deed is very elaborate and on the surface presents an artificial and intricate appearance. So far as concerns her own personal interest, and perhaps as to the interests of her immediate successors, the plaintiff might have been able to understand it without assistance. But it would have been manifestly impossible for her or anyone but an expert to follow the ulterior limitations of the deed. This fact is noted in passing, but its importance will be found considerably reduced by circumstances hereafter mentioned. The deed was drawn out into great prolixity, partly from an evident anxiety to avoid collision with the rule against perpetuities. Notwithstanding this, the acute criticism of learned counsel has fastened upon a supposed error, several times repeated.

I. I agree with them that the deed is to be construed as if the rule did not exist, to this extent, that the true construction cannot be varied to avoid the effect of the rule. I also agree with the proposition on the other side, that where an expression is fairly doubtful, equally susceptible of two constructions, that construction is to be preferred which would create a legal rather than an illegal interest. This principle is especially applicable in cases where the whole context manifestly shows, as in this instrument, that the rule against perpetuities was held in contemplation. *Gray on Perpet., sec.* 633.

Extracted from its context (with which however it must be carefully compared) the expression in question reads as follows:

"And if any such issue (issue of the grantor living at her death) shall die under the age of twenty-one years without leaving issue living at the time of his or her death, then as to the entire property, as well original as accruing under this deed of such issue so dying, *in trust for or as the case may be to be conveyed to the issue then surviving* of the said Elizabeth," &c.

The words "in trust for or as the case may be," are elliptical, and in order to complete the meaning, something will have to be read into them. That is clear enough, but it is not so clear what the words are that must be supplied. As claimed by counsel for plaintiff, the expression must be understood to read as follows: "*In trust for* (if under age) *or as the case may be* (if over age) *to* be conveyed to," &c. They have shown that, by this construction, there is a possibility that the trust might not end for forty or fifty years after the death of Mrs. Whitridge, as to some of her possible remote issue, and there are plausible arguments for this construction, and they have been very ably and forcibly urged. On the other hand, the ellipsis is sought to be filled by reference to the immediately preceding context, so as to make the expression read somthing like this: In trust for (if as last aforesaid) or as the case may be (if otherwise). The immediately preceding context, to which this reference is made, is as follows: "Shall be held in trust by said trustees for the benefit of such issue" (issue of the grantor living at her death) "until he or she shall arrive at the age of twenty-one years, and then to be conveyed to him or her." By thus referring the trust immediately in question to a trust for those only for whose use a trust had just before been declared, the trust is obviously limited to issue living at the grantor's death, and as to all other issue (not living at her death) included within the expression, "or, as the case may be," no trust had been previously declared, and none is intended to be

created by the clause in question. The elliptical expression thus draws upon its immediate antecedent for its filling, and the deed naturally becomes its own interpreter. By it no estate is attempted to be created beyond a life in being and twenty-one years thereafter. The same expression is repeated in subsequent paragraphs, and each time is susceptible of a similar construction. The clause criticized does not, in my opinion, violate the rule against remoteness, and even if it did, the striking down of this clause for the benefit of the issue would not invalidate the previous trust for the benefit of the grantor. "When successive estates are created and the first in order of succession is not void for remoteness, it is good, although the subsequent estates should be void for that reason." *Goldsborough, et al. vs. Martin,* 41 *Md.*, 502.

II. The deed reserves to the grantor no power of revocation, and this omission is relied on by the plaintiff, if not to condemn the deed absolutely, at least to raise a presumption against it. There is a class of voluntary settlements to which powers of revocation are appropriate, and another class to which they are not. It is not deemed necessary to discuss the numerous cases cited on either side, since it is fairly well settled that each case depends, in this regard, upon its own facts. *Phillips vs. Mullings, L. R.,* 7 *Ch. App.,* 244; *Hall vs. Hall, L. R.,* 8 *Ch. App.,* 430; *Toker vs. Toker,* 3 *De G., J. & S.,* 487.

A voluntary settlement by an heiress, such as that made by this deed, was not needed at its date and is not needed now, merely to protect the property against a future husband's debts or marital control. In the then existing and present state of legislation and society, the object of such a settlement manifestly is the protection of the woman herself; protection against the unpleasant necessity of saying no, against the possible disaster of

saying yes.   Its fundamental object is to promote the
happiness of married life by placing a woman's fortune
beyond the reach of a husband's solicitations and out-
side the risk of his business ventures.   To put in such
a deed a power of revocation would simply be a stand-
ing suggestion to a mercenary husband to keep the
woman in a continual worry until she executed the
revocation.   Plainly, the insertion of a power of revoca-
tion would defeat the main object of such a settlement,
and its absence therefrom affords no ground of attack.

III.  One of the trustees named in the deed, William
H. Graham, the plaintiff's father, died in 1885, and his
place was filled by the appointment of the plaintiff's
husband.   Afterwards, the other trustee, Mr. Bowdoin,
retired at the instance of the plaintiff, and Dr. Moale,
was appointed in his place, upon the nomination of the
plaintiff and her husband.   The present trustees are,
therefore, the plaintiff's husband and a friend of his and
her selection.   Their co-defendants are the plaintiff's
infant children and a number of infant descendants of
George Brown, ultimate remaindermen under the deed.
These infant defendants are represented by counsel
assigned by the Court.   The trustees are represented
by their own counsel, their position being somewhat
peculiar.   When the case first went to the examiner the
plaintiff dictated her testimony from a written paper.
This was excepted to for that reason, and also because
she was not competent as a witness on her own offer.
The Circuit Court, (Judge DENNIS), the trustees mak-
ing no defence, declined to go on with the case as thus
presented, appointed counsel to represent the infants
and remanded the case to the examiner.   *The plaintiff
was then called by the trustees,* and in substance reiterated
her former testimony.   To this exceptions are inter-
posed by infants' counsel, because the trustees, by whom
she was called as a witness, are parties opposed to her
in name only, as is shown by the following facts:

1. One of the trustees is her husband, equally interested with her, or even more interested than she, in setting the deed aside, as his testimony shows.

2. The answers of the trustees, though filed by them in proper person, were in reality prepared by plaintiff's own counsel, as was frankly admitted by her counsel at the former hearing.

3. The appearance of separate counsel for the trustees was entered only after objection was made at the former hearing to the competency of the plaintiff as a witness on her own offer, and there would be no object in calling her as a witness except to impeach the deed.

These exceptions I think well taken. If the deed of trust is not the "cause of action" of a suit, whose object is its cancellation, what is the cause of action? One of the parties to it is dead, and the plaintiff is not a competent witness upon her own offer. *Pairo vs. Vickery, et al.*, 37 *Md.*, 488. In no truthful sense can the trustees, the husband and the husband's nominee, be styled the plaintiff's "opponents" within the letter and spirit of the Evidence Act. Code, Art. 35, sec. 2. They are opponents only in the sense that their names appear on the opposite side of the docket and that their fiduciary and representative capacity requires them to be made defendants *ex officio*. In actions at law not collusive the positions of plaintiff and defendant are necessarily antagonistic. The more comprehensive rule as to parties in equity often requires joinder of defendants whose interests conflict with each other and may be identical with the interest of the plaintiff. Relief may be given to plaintiffs against co-plaintiffs and to defendants against co-defendants, as well as to plaintiffs against defendants. (Code, Art. 16, sec. 161.) In the presence of this rule the proposition is manifestly unsound that the only test of opposition in a suit in equity within the meaning of the Evidence Act, (Code, Art. 35, sec. 2,) is opposition of names upon the docket.

Whitridge *vs.* Whitridge, *et al.*

In the case cited the record shows that the plaintiff's husband was made a co-defendant, and yet the expedient of making her a competent witness by having her called by him, was never thought of, although Mr. Pairo would very gladly have allowed himself to be used for that purpose. 37 *Md.*, 488.

Now in this case the real opposition of interest is between the husband and the infant defendants. That appears conclusively not only from the situation itself, but from two papers filed in the case, the answer of Mr. Whitridge and the plaintiff's petition of the 24th July, 1890, expressly stating that his interest is adverse to the interests of the infant defendants.

That parties who have voluntarily accepted the duties and responsibilities of trustees can be permitted by a Court of equity to utilize their fiduciary positions for their private ends, to the full extent of contributing to break up the trust confided to them and destroy the title under which they claim, and that to the prejudice of infant remaindermen *c. q. t.*, is a proposition for which no authority has been cited and a precedent which this Court finds itself unable to establish.

IV. It is claimed that the deceased father of the plaintiff acquired personal benefits under this deed, a direct pecuniary benefit in the shape of trustee's commissions upon the income, a contingent benefit to the extent of one moiety of the *corpus*, in the event of the grantor's death without issue and of his surviving her, and a more remote contingent benefit to the extent of the other moiety, in the event of the last named contingency, coupled with that of the death of the brother without issue. That is true, and it is also true that such a transaction between parent and child is *prima facie* voidable upon reasonable application by the latter, and devolves upon the parties claiming under the deed the *onus* of establishing by proof the fairness of the trans-

action.   Here the trustees, the official representatives of all parties in interest, and the persons upon whom the *onus* of sustaining the deed properly devolves, are making no defence, but on the contrary are found actively co-operating in the attack.   For reasons already explained, this course is natural on their part.   None the less, the situation is unprecedented and anomalous.   The attitude of the infant defendants has been commented on by the plaintiff's counsel as that of "mere volunteers," but counsel have not gone so far as to claim that the infants have no rights entitled to respect from the Court.   I therefore entirely concur in the propriety of the course already taken by the Judge named, in appointing counsel specially charged to represent their interests, contingent and apparently remote as some of those interests are.

The duty assigned to the counsel for the infant defendants, is that of sustaining by proof the fairness of a transaction obscured by the lapse of fourteen years, and the intervention of successive deaths.   Five important deaths have occurred since the transaction, including that of every person, without exception, whose connection with it has been arraigned.   These are the plaintiff's father, William H. Graham, her grandmother, Mrs. Isabella Brown, her uncle, George S. Brown, and the confidential business adviser of the plaintiff and her family, David M. Perine.   All these deceased persons, are charged with conduct in their life-time, which, if it does not exactly amount to conspiracy in the eye of the criminal law, would, if charged against living persons of reputable character, be promptly resented as an unworthy imputation, and which in its mildest form, classifies itself under the equitable doctrine of constructive fraud.   Besides these four, another name is added by the testimony, and that is the name of the late Judge Brown, under whose supervision and counsel as the kins-

man and friend of the plaintiff and her family, the deed of trust was actually framed.

In addition to this, we have the important fact, admitted in the bill, that shortly after her marriage, which took place soon after the execution of the deed, and while all these parties were living, the circumstances fresh and the entire evidence available, the deed of trust now impeached was laid before counsel by her husband at her request, "*together with the circumstances under which it was procured to be executed by your oratrix,*" and his opinion requested as to the validity thereof, whereupon her husband "was informed by said counsel that said deed could not be successfully impeached." To this opinion she says that she and her husband "felt obliged to submit," but gives no reasons why they should so feel, and no explanation why the same freedom of volition and action which led her and her husband to take the advice of one lawyer, did not lead them to check off that advice, if unsatisfactory, by taking, in a matter of $350,000, the opinion of other lawyers, equally competent. In point of fact, however, the confirmatory advice of other counsel was afterwards obtained. The bill goes on to state, that after her father had become better acquainted with his son-in-law, her father "repeatedly expressed to your oratrix his deep self-reproach and repentance for the part he had taken in forcing her to sign said alleged deed," "implored her forgiveness for the injury he had done her," "expressed his desire to make reparation to the utmost, and consulted counsel to procure the said deed to be set aside, if he could accomplish it. Accordingly, he sent for his counsel and laid said deed before him, but was advised by said counsel that it was valid, and could not be set aside in a Court of justice."

It is to be presumed that the late Mr. Graham, in the state of mind and feeling towards his daughter, and the

transaction thus vividly portrayed, did not mislead his counsel and betray his daughter by suppressing the material facts within his personal knowledge, and a part of which he was.

Thus we have it, that on two different occasions after the deed was made, the plaintiff had the advantage of professional advice; *independent,* because wholly outside the sphere of undue influence alleged; *competent,* because otherwise it would not have been invoked beforehand, nor acquiesced in afterwards; and *with full knowledge of all the facts,* because the bill so states expressly as to one, and by necessary implication as to the other.

"If the deed had originally been executed after such independent counsel, the case would have met the requirements of the strictest rule which has ever been applied anywhere, by any authority, to gifts or purchases between principal and agent. We know of no rule which prevents a Court of equity from construing the act of the party (after full knowledge of the character and effect of the paper executed, and competent and independent advice,) by which all claim to have it set aside is abandoned, into a reaffirmance of the paper." *Kerby vs. Kerby,* 57 *Md.,* 356–7.

The difference between the two cases is, that in the case cited the abandonment of a suit actually commenced was an act of reaffirmance or confirmation, while here there is the abandonment of the intention, but not of the disposition to commence a suit, equivalent to a *confession,* with full knowledge of rights, that the plaintiff had no case on the facts. Such a confession made shortly after the event, and under professional advice, while not a confirmation, nor an estoppel, is *evidence* far more persuasive than any testimony of hers now could be, even if admissible, and its probative force is augmented to a degree of conclusiveness by the lapse of time and intervening deaths of all important witnesses.

It will be further observed, that in the case cited, the Court carefully distinguishes this defence fron the ordinary defence of laches, and adverts to the facts mentioned "as elements to be considered in making up judgment upon the main point." 57 *Md.*, 357.

These facts, so far as essential, are present and active elements in this case, and besides them, there are others not present in the case cited.

V. It appears from the bill, that the late David M. Perine (well known as a Register of Wills for many years) had drawn the will of George Brown, the plaintiff's grandfather, and from the will itself, that he was the first named trustee under it. The plaintiff also alleges in her bill, that said Perine was known to her as the confidential lawyer and an old friend of the Brown family, and was employed by them to draw the deed in question.

Amongst the papers left by Mr. Perine, two letters from the plaintiff were found by his executor, and they are filed as exhibits. These letters were written shortly before the deed was executed. In them she acknowledges the interest always taken by Mr. Perine in herself and brother, hopes he will "continue to arrange it," meaning the deed of settlement, gives instructions as to several details, and especially as to the contingent provision for her father, which she insists upon being enlarged. These letters are not mentioned in her bill. They are not charged to have been extorted from her. If they stood alone, it might be said that the same presumption against the deed also operated against them, that is, they would also be presumed the result of the paternal authority. Read, however, in the light of the attempts subsequently made to invalidate the deed, and the repeated advice of counsel in *possession of all the facts*, upon which the attempt was abandoned, these letters are significant. They are scarcely consistent with the charge

in the bill, of Perine's duplicity, that "while professing to be giving her legal advice, he was in the whole transaction the family lawyer, and not her's and acted therein for her grandfather's heirs, and not for her benefit." Taken in connection with the circumstances above mentioned, the production of these letters fills up the measure of proof required to the entire satisfaction of this Court. I will even go so far as to say, that upon the authority of 57 *Md.*, 345, above cited, the defence would have been complete without their production.

VI. A portion of the testimony of Frederick J. Brown, Esq., the draftsman of the deed, has been excepted to by plaintiff's counsel as hearsay, and the exception is well taken. But enough of it remains, in connection with the averments of the bill, to show that his father, the late Judge Brown, was called in by Mr. Perine to give his counsel in the matter of the deed, and that Judge Brown acted, not of course professionally, but as the kinsman and friend, not only of the family, but of the young lady herself, watchful of her interests, as is shown by the increase, at his instance, of the amount to be left at her absolute testamentary disposition. Seeing the plaintiff supported upon the one side, and upon the other by two such friends and advisers as David M. Perine and George Wm. Brown, it is not surprising that the counsel to whom the whole case, while fresh, was submitted for an opinion, should have taken the view that this young lady acted not improvidently, nor unadvisedly, nor involuntarily, but with such surroundings as in her circumstances amounted substantially to independent competent advice, even before the execution of the deed. They were the two men to whom of all others it was natural that she should have gone, had she been seeking important business advice. If a transaction of so much importance had been consummated without their knowledge, no matter under whose advice, or how

obtained, that circumstance alone would have thrown a degree of suspicion around it, greater or less according as it combined with, or was neutralized by, the other circumstances surrounding the transaction. Naturally, the first question to be asked would be, why did she not have the counsel of Judge Brown and Mr. Perine, the one her kinsman, the other her friend, and both of them, so to speak, hereditary counsellors?

VII. Add to this, that it was well known to those of counsel, and is indeed frankly admitted in the bill, that the full extent of the contingent provision for the father's benefit was the result, not of his pressure, but of her own free will and persistent determination, and it seems too much to ask of a Court, at this late day, after time and death have done their work, to set at naught the conclusions of the plaintiff's and her husband's counsel, and the independently concurring opinion of her father's counsel, founded upon data in the one case furnished from her own standpoint; in the other volunteered from the opposite standpoint in her own interest; and both combined far more complete and satisfactory than any data now attainable. It is especially noticeable that from the nature of the case there can be no new discovery as to any matter of evidence, and none in fact is claimed.

VIII. It has been already stated that besides the fortune left her by her grandfather, the plaintiff at the date of the deed had expectations from other relatives which have since matured. Her father and her grandmother died in 1885, leaving her large legacies. From her father she received considerably over $100,000, and from her grandmother, Mrs. Isabella Brown, $25,000. Would these legacies have been left to her absolutely, in her own right, had the testators not made their wills under the fixed assurance that she had finally acquiesced in the settlement of the bulk of her fortune, in trust? Would these legacies have been left to her at all, if, during

their life-time, the plaintiff had ventured to spread upon the public records the charges which constitute the gravamen of the pending bill? Can an expectant hold back a grievance against a wealthy relative until after testamentary expectations have been realized, and then come forward and realize also upon the grievance?

But it is unnecessary to press home the delicate investigation suggested by these inquiries. Sufficient ground has already appeared for dismissing the bill, and a decree will be passed to that effect.

A decree was accordingly passed dismissing the bill. From this decree the complainant appealed.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, BRYAN, and MCSHERRY, J.

*Julian I. Alexander, Arthur W. Machen,* and *Bernard Carter,* for the appellant.

*James M. Ambler, Arthur George Brown,* and *John T. Morris,* for the appellees, the infant defendants.

*John N. Steele,* (with whom were *Francis K. Carey,* and *John E. Semmes,* on the brief,) for the appellees, the trustees.

MCSHERRY, J., delivered the opinion of the Court.

The object of this proceeding is to vacate and set aside a voluntary deed executed by Miss Elizabeth Graham, now Mrs. Elizabeth Whitridge, less than six months after she had reached the age of twenty-one, and about two months prior to her marriage. The deed recites that she had attained the age of twenty-one and was desirous of settling her property in trust, and then in consideration of the premises and of one dollar conveys to her father, William H. Graham, and her cousin,

William Graham Bowdoin, all the property of every kind which she was entitled to, either in possession or by way of remainder, whether vested or contingent, under the will of her grandfather, George Brown, deceased. This property, amounting in value to about four hundred thousand ($400,000.00) dollars, had been given by the will of her grandfather to five trustees, William H. Graham, her father, being one, to be held until Miss Graham should arrive at the age of twenty-one, and thereupon the trust was to cease and the property was declared to be the "absolute property of said Elizabeth." Miss Graham was but four years old when her grandfather died, and from that time until after she attained her majority this property remained in trust in the hands of her father and the other trustees under her grandfather's will. She attained her majority on the twenty-fifth day of March, 1876, and on the seventh of August following she executed a release to these trustees acknowledging the conveyance and transfer by them to her of all the property to which she was entitled under the will of her grandfather. On November the ninth, 1876, the deed of trust now in controversy was signed. Its provisions are intricate and complicated, though perfectly intelligible to a trained professional mind. By this deed she irrevocably parted with the possession of and the title to every dollar of this large estate. The deed declares that the net income of the property, after the payment of commissions, expenses, and taxes, shall be paid to her, not as it may accrue, but in quarterly instalments, for and during her life. The right to dispose by will of one hundred and fifty thousand dollars of the settled property to whomsoever she pleased was reserved to her by the deed; and the residue was limited in trust, first, to her children upon their attaining twenty-one years of age, and to the descendants of a deceased child dying under that age; with power in her to prefer

and apportion by will amongst her issue; secondly, in the event of her dying without leaving a child or children or issue capable of taking under the terms of the remainder first created, then the residue, together with the one hundred and fifty thousand dollars if undisposed of by will, was limited in equal moieties, but unequal estates, to her father and brother—to her father absolutely, and to her brother for life—with cross-remainders and ultimate remainders to the heirs-at-law and next-of-kin of her grandfather, George Brown, and a power was superadded to prefer and apportion amongst these heirs-at-law and next-of-kin by last will and testament. The deed contains no power of revocation and no restraint on the right of the settlor to alienate her life estate; and, whilst making provision for the appointment of new trustees to succeed those named in the first instance, gives to her no voice in their selection, and allows her no participation whatever in making or changing investments. No part of the *corpus* of the estate can be used by her— it is placed absolutely beyond her reach—and she is wholly powerless during her life to advance a dollar of all this property to her children or to others whom she may wish to aid, no matter how desirable or meritorious such a step might be. In a word, she has been deprived of all control over her property, and has been reduced by the deed to the position of a mere annuitant upon her own estate. And not only is this so, but the very instrument which has produced these results, conferred a substantial benefit on her father, one of the grantees in the deed and one of the trustees by whom, under the will of George Brown, the very same property had been held and managed for the settlor from her early infancy. The benefit derived by her father was dependent, it is true, upon the contingency of his survivorship and of her death without leaving children, except as to the commissions which were unconditionally allowed. A

young girl just twenty-one years of age, entitled in her own right without a single restriction to a large fortune, by a voluntary conveyance not only stripped herself of every dollar of that fortune, but granted the half of it to her father, if he survived her and she died without issue, though he had but three months before ceased to control it as testamentary trustee, whilst not relinquishing actual dominion over it. A gift obtained where the relation of parent and child exists, and under such circumstances as these, is *prima facie* void, and *the burden is on the donee* to establish to the full satisfaction of the Court that it was the free, voluntary, unbiased act of the donor. A Court of equity, on grounds of public policy, watches such transactions with a jealous scrutiny, and to set them aside it is not necessary to aver or prove actual fraud, or that there was such a degree of infirmity or imbecility of mind in the donor, as amounts to legal incapacity to execute a will or a valid deed or contract. *Todd vs. Grove*, 33 *Md.*, 195; *Williams vs. Williams*, 63 *Md.*, 371. Lord ROMILLY in *Cook vs. Lamotte*, 15 *Beav.*, 239, declared the law as follows: "The rule in cases of this description is this—Where those relations exist by means of which a person is able to exercise a dominion over another, the Court will annul a transaction under which a person possessing that power takes a benefit unless he can show that the transaction was a righteous one. It is very difficult to lay down with precision what is meant by the expression 'relation in which dominion may be exercised by one person over another.' That relation exists in the cases of parent, of guardian, of solicitor, of spiritual adviser and of medical attendant, and may be said to apply to every case in which two persons are so situated that one may obtain considerable influence over the other. The rule of the Court, however, is not confined to such cases. Lord COTTENHAM considered that it extended to every case in which a

person obtains by donation a benefit from another to the prejudice of that other person and to his own advantage, and that it is essential in every such case, if the transaction should be afterwards questioned, that he should prove that the donor voluntarily and deliberately performed the act, knowing its nature and effect. It is not possible to draw the rule tighter or to make it more stringent, and I believe it extends to every such case." And in *Everitt vs. Everitt, L. R.*, 10 *Eq.*, 405, by a settlement by an unmarried lady a few months after she attained twenty-one, it was declared that a sum of money to which she was entitled absolutely, should be held by the trustees (who were her stepfather and uncle,) upon trust to invest the same in certain specified classes of securities, and vary the same at the trustees' discretion, and pay the income to the settlor for life, for her separate use, with restraint on anticipation if and when married, and, after her death, to hold the fund in trust for the settlor's children as she should by will appoint; and in default of appointment, for the children absolutely, and in default of children as the settlor should by will appoint, and in default for her next-of-kin. The trustees were empowered at the settlor's request to raise seven hundred pounds out of the fund, and pay the same to her for her separate use. Power of appointing new trustees was reserved to the surviving or continuing trustee, or to the executors or administrators of the last surviving trustee. The deed was prepared under the advice of a solicitor, who was the solicitor and friend of the stepfather and known to the plaintiff. Upon bill, nine years afterwards, by the settlor (who had remained unmarried) to have the settlement set aside, it was held that the deed was void. Sir W. M. James said, "In this case I do not think the settlement can stand upon the rules laid down in *Prideaux vs. Lonsdale,* 1 *De G., J. & Smith,* 433, and the other

cases cited. It is very difficult indeed for any voluntary settlement made by a young lady so soon after she attains twenty-one, to stand if she afterwards changes her mind, and wishes to get rid of the fetters she has been advised to put upon herself.''

But it is needless to multiply references to adjudged cases on this subject, nor is it necessary in the decision of this case to go to the length of holding that the donor must have, in such transactions, the benefit of competent and independent advice, as seems to be the rule in England; *Allcard vs. Skinner, L. R.*, 36 *Ch. D.*, 181; *Rhodes vs. Bates, L. R.*, 1 *Ch. App.*, 252; because it is the firmly settled law of Maryland that a gift or voluntary conveyance between living parties standing in the confidential relation of parent and child is *prima facie* void, and when assailed by the donor or grantor, can only be upheld if satisfactorily proved to have been the free, voluntary, and unbiased act of the person who made it.

Mr. Graham, the father of Mrs. Whitridge, is dead, and Mr. Bowdoin has retired from the trust; but other trustees have been appointed in their stead, and stand in their place. The deed being now assailed, the new trustees to uphold it are required to show, just as their predecessors would have had to do in a like case, that it was the free, voluntary, and unbiased act of the settlor, or, under the doctrine just alluded to, it must fall. The burden of proof is on them, precisely as it would have been upon those whom they have succeeded. Upon the advice of a most eminent and disinterested counsel —the late Mr. I. Nevett Steele—the new trustees called the plaintiff, Mrs. Whitridge, as a witness and she has testified at length. Her testimony has been excepted to by the infant defendants, three of whom are her own children, represented by counsel assigned by the Court, and the others of whom are more remotely interested in

the contingent remainders limited by the deed to the next-of-kin and heirs-at-law of George Brown, deceased. Upon her own offer she was not a competent witness, but she became competent when called and examined by the trustees, who are the real defendants. At the common law she would have been disqualified as a witness on account of her interest in the subject of controversy; but the Evidence Act of 1864, and its various amendments (*Code, Art.* 35, *secs.* 1 *and* 2.) have removed interest as a ground of objection to the competency of a witness; and unless she be excluded by some of the exceptions embodied in the Code, she is competent. Where a party to a contract or cause of action is dead, the living party cannot testify on his own offer, but may be examined if called by the opposite party to the cause. *Code, Art.* 35, *sec.* 2. The death of her father, who was one of the parties to the deed, which is the subject of the pending controversy, excludes Mrs. Whitridge from giving tesmony as a witness on her own offer; but though thus disqualified she clearly was competent under *section* 2, *Art.* 35 *of the Code,* when produced by the defendants—the trustees—and her evidence is properly before us.

If there were any ground for a suspicion that Mrs. Whitridge and her husband who is now one of the trustees by substitution in place of her father, and, consequently one of the defendants, had by collusion caused her to be called, we should, even if treating her testimony as technically admissible, attach no value or importance to it whatever. But we find nothing in the record upon which such a suggestion, or even the shadow of such a suggestion, can be founded. On the contrary, her evidence throughout bears the clearest possible impress of truth, accuracy, and candor; and is strongly fortified in several particulars.

Without going into a minute recital of all the evidence in the record, a brief reference to the leading and

material circumstances preceding and accompanying the execution of the deed, will show most conclusively that that paper was far from being the free, voluntary, and unbiased act of Elizabeth Graham. There is nothing justly to fasten the stigma of positive fraud upon any member of her family who participated in inducing her to sign the instrument; and the able lawyer, Mr. Frederick J. Brown, who drafted the deed, acted throughout with the most absolute good faith and integrity. But however honest may have been the motives which influenced her grandmother and one of her uncles, and ultimately her father, to take the part they did, their zeal to make *their* wishes, as reflecting the supposed or assumed intentions of her grandfather, the sole guide of *her* conduct in this transaction, over-mastered her volition and fettered her freedom of action.

William H. Graham married one of the daughters of George Brown. Two children were born to them, and when the younger, Mrs. Whitridge, was eighteen months old her mother died. Mr. Graham never married again. He, with his two children, resided in the Brown mansion. When the plaintiff was four years old her grandfather Brown died, and under his will she became entitled, on attaining twenty-one, to one-fourteenth of his vast estate. She was reared with the greatest care and affection, and from infancy to womanhood her life was spent in the seclusion of her home. Her devoted attachment to her father and her reverence for her grandmother caused *their* wills to be the law of *her* actions; whilst the frequent inculcation of the duty of absolute obedience made submission to their judgments in all things, even the most trivial, the unvarying rule of her conduct. With no experience whatever in matters of business, but little acquaintance with the outside world, and only a vague and indefinite notion as to the value of the property to which she would ultimately be entitled under

her grandfather's will, she was constantly reminded by
her grandmother and her uncle George S. Brown, as she
approached her majority, that her grandfather's purpose
and design had been that she should, immediately upon
attaining twenty-one, settle her property in trust; though
no particulars of the trust were mentioned to her at that
period. The importance and necessity of executing it were
continuously urged upon her, and unceasingly kept before
her. She was told that Mr. David M. Perine, who had
been her grandfather's adviser, and had drawn his will,
and who was one of the trustees thereunder, was per-
fectly familiar with her grandfather's wishes with refer-
ence to her share of his estate; and that if she respected
those wishes she would promptly make a deed of trust
upon the very day she became of age. Instructions
had actually been given to Mr. Perine for the draft of
a deed of trust before she reached her majority, but an
accident deferred its preparation. She was further told
by her grandmother and her uncle George S. Brown, that
the reason her grandfather had not put her share in trust
himself, was to give her "father the courtesy to elect to
put it in trust or not." And this statement was repeated
to her by Mr. Perine in the only business interview she
ever had with him. He further said, as she has testified,
"it was obligatory that I should put it in trust; it was
my grandfather's wish, and that he had put my aunt's
(Mrs. Greenway's) in trust, and that it was only right
it should be done." Mr. Perine "used every influence
that a lawyer could use to a young girl that was trying
to protect the man that she was going to marry." She
was thus led to believe and was fully impressed with the
conviction by these and similar statements, frequently
made by her grandmother, and her uncle George S.
Brown, that her interest in her grandfather's estate was,
in accordance with his wishes, to be placed by her in
trust, if her father so elected when she attained twenty-

one. No such wish was in fact expressed in the will—— she was left the property absolutely upon attaining twenty-one; but she had never seen the will. Trusting with implicit confidence in these statements, she seems never to have doubted the right of her father "to elect" to put her property in trust. In this condition of belief as to her father's right over her property, she became engaged to her present husband during July, 1876. Upon the family being apprised of her engagement the efforts to secure the deed of trust appear to have grown more active. It was insinuated that Mr. Whitridge was a fortune-hunter; that he was not worthy of her; that to test his sincerity she should execute the deed, and if he were in reality merely seeking her fortune he would then retire from the engagement. She was told that Mr. Perine, who had had large experience in the settlement of estates, knew of many sad instances where fortunes had been lost through the improvidence of husbands or the vicissitudes of business, because the precaution to put the wife's property in trust had been neglected. The delay in executing the deed caused her grandmother worry, anxiety and sickness; it produced domestic jars which were of necessity painful in the extreme to a young and inexperienced girl. The culmination was reached when she was told that if the deed "was not made it was a proof that Mr. Whitridge's influence was greater than their love and affection * * * * and that as a proof of my love and affection, and also as a proof that Mr Whitridge had not had any thing to do with it, *I must sign that paper.*" Finally her father, influenced no doubt in a great degree by the wishes of her grandmother, and to some extent controlled by his own un-questionably honest, but none the less mistaken, belief that he was acting for his daughter's best interest, united with the others in requesting her to execute a deed; and Mrs. Whitridge says "father and my grandmother

and my uncle George all said it ought to be put in trust; *I did not want it put in trust;* but I had promised father I would put it into trust, after a great deal of reluctance, to prove that Mr. Whitridge was not after the money." When her word had been thus pledged she strenuously insisted that her father should be made one of the beneficiaries under the deed, and in deference to her wish this was acceded to; but the suggestion by her, and the yielding by them of this point, made the deed when finally executed none the less the outgrowth of the very influence which obtained from her the promise to sign it. In *Huguenin vs. Baseley*, 14 *Ves.*, 273, (which Sir WILLIAM MILBOURNE JAMES, Lord Justice, said in *Hall vs. Hall, L. R.*, 8 *Ch. App.*, 436, was "one of the most celebrated and valuable [cases] in our reports,") Lord ELDON observed, "The question is, not whether she (the complainant) knew what she was doing, had done, or proposed to do, *but how the intention was produced.*" Situated, surrounded, and bewildered as Miss Graham then was, her affection for her father and her duty of obedience to him persistently arrayed against her attachment to Mr. Whitridge, the alternative was given her of signing the deed, or of being denied her father's approval of her marriage, and she blindly consented to take a step the significance and results of which she manifestly did not understand. She wrote to Mr. Perine, who, she supposed, was preparing the paper, that seventy-five thousand dollars were to remain in her own right, and the rest was to be put in trust. The deed, as executed, put *all* in trust. She again wrote to Mr. Perine that she wished half of her estate to be put in trust for her brother George and his children, if she should die without issue, but if he left no children "then his portion, without any condition whatever, for him to do with as he likes." The deed as signed restricts her brother to a mere life estate. It is doubtful whether either of these

letters was ever seen by the draftsman of the deed. She wished her aunt, Mrs. Greenway, provided for in the deed, but this was equally ignored. Two drafts were rejected by her, but the third one was signed without her having read it—she skimmed over it without understanding its meaning. It was explained to her by no one. Its results were not pointed out to her. She was not told that by signing it she would divest herself of all her property, or that she was under no obligation to sign it if she preferred not do so. She was given no choice, but was held to the promise she had made. Her father mistook his duty towards her. He should have explained the contents of the deed fully to her, and have informed her that she was at perfect liberty—that it was her legal right—to sign it or not as she might prefer, without reference to, or even against, the wishes or importunities of himself, her grandmother or her uncle. He should have informed her that under her grandfather's will the property proposed to be conveyed in trust was absolutely her own, and that he, her father, was not at liberty under that will to elect to put it in trust. But he did nothing of the sort. In *Williams vs. Williams, supra,* the advice given by the father to the son respecting the execution of a deed of trust was, "I warned him that he was taking an irrevocable step; that he ought very deliberately to consider it;" and this Court, speaking through Judge Bryan, in a clear, well-considered and vigorous opinion said, "this was very far short of what the law required, and of what so important a step demanded." And yet it went much beyond any advice which Mr. Graham gave his daughter. Mr. Frederick J. Brown who prepared the deed received his instructions from Mr. Graham, and probably from Mr. Perine, but not from her; nor did she know until after its execution that it had not been drawn by Mr. Perine. Mr. Frederick J. Brown never spoke to her on the subject

of the deed, and was never asked to give her any advice with regard to it, and in fact he gave her none.

Under all these circumstances it is difficult to escape the conclusion that the deed was not the free, voluntary, and unbiased act of the settlor. And this conclusion is greatly strengthened by the subsequent conduct of Mr. Graham. Some years after the date of the deed he consulted counsel with a view of having the deed annulled. He told his daughter that he deeply regretted having persuaded her to sign it; that her grandmother's health had not been strong, and that Mr. Perine had advised him to get her to sign it as it was an ordinary deed of trust; but that he never would have made such a mistake if he had not gone to the family lawyer, Mr. Perine. The opinion with which he was furnished by the counsel to whom he had applied was to the effect that the deed could not be assailed; and shortly thereafter Mr. Graham died, leaving by will to Mrs. Whitridge upwards of one hundred and fifty thousand dollars absolutely. He realized the injustice he had, from the best of motives, been instrumental in subjecting his daughter to, and when he sought to rectify it, and was told he was powerless to do so, he made the only reparation he could,—he implored her forgiveness, and he left her the half of his estate untrammelled by any trust or condition. He was conscious that he had unduly exerted his influence. As observed by Lord BROUGHAM in *Hunter vs. Atkins*, 3 *Myl. & Keene*, 141, "all men have the interpreter of" the rule "within their own breasts; they know the extent of their influence, and are *conscious* whether or not they have taken advantage of it in a way in which they would feel indignant that others similarly circumstanced should do with regard to themselves." It was this consciousness which prompted Mr. Graham to consult his own counsel in the hope that he might remedy the wrong in which he had participated.

It is obvious that the deed cannot be treated as the free, voluntary, and unbiased act of Mrs. Whitridge, if in fact she did not understand it when she executed it. Apart from her own unequivocal testimony that she did not read it and did not understand it, the deed itself by its unusual provisions, and by reason of the absence of ordinary clauses generally inserted in such instruments, furnishes strong intrinsic evidence that the settlor did not comprehend it. Mere improvidence in a deed is not sufficient of itself to warrant a Court in annulling it. *Goodwin vs. White*, 59 *Md.*, 504. But this may be a circumstance of much weight in determining the question of the settlor's knowledge of the contents of the deed. Or as stated by Sir GEORGE JESSEL, M. R., in *Dutton vs. Thompson*, L. R., 23 *Ch. Div.*, 281: "It is not the province of a Court of justice to decide on what terms or conditions a man of competent understanding may choose to dispose of his property. If he thoroughly understands what he is about, it is not the duty of a Court of justice to set aside a settlement which he chooses to execute on the ground that it contains clauses which are not proper. No doubt if the settlement were shown to contain provisions so absurd and improvident that no reasonable person would have consented to them, or if provisions were omitted that no reasonable person would have allowed to be omitted, that is an argument that he did not understand the settlement." And in *Toker vs. Toker*, 3 *De G., J. & S.*, 491, Lord Justice TURNER said: "The absence of a power of revocation is I think a circumstance to be taken into account in determining such cases as these, and it is a circumstance of more or less weight according to the facts of each particular case." It is highly improvident for a young woman just twenty-one, and about to be married, to divest herself by deed forever and irrevocably of all title to and control over her property, without the slightest reference to or pro-

vision for any of the contingencies which might arise in the future in the new relation of life upon the threshold of which she stands. It is equally improvident in one so circumstanced to surrender by such a conveyance all testamentary power over the bulk of her estate, save the right to appoint among persons of a designated and selected class—to tie it up beyond recall, and to abandon all participation in its investment. In the nature of things it is not possible,—at all events, it is not probable —that she understood the full import of an instrument leading to such results as this deed was certain to produce. But what has been said of the contents of the deed is quite sufficient, without reiteration, to exhibit its improvident character. This is one of the circumstances which corroborates her testimony when she deposed that she did not understand the dispositions made by the deed.

It has, however, been strenuously insisted that the application to annul the deed has come too late. That as all the parties to the transaction are dead, with the exception of Mrs. Whitridge, it would be exceedingly dangerous to disturb the deed; and that there are no living witnesses left to defend it. The defence of *laches* and acquiescence is accordingly invoked. It is true that Mrs. Brown, Mr. George S. Brown, Mr. Graham and Mr. Perine are all dead; but it is not true, from anything that appears in the record, that the filing of the bill was purposely deferred until they had passed away. Within a few months after her marriage, Mrs. Whitridge, in having her will drawn, laid the deed before an eminent lawyer and asked his opinion as to its validity. She was informed that whilst it was unusual in its provisions, it was not open to impeachment. Relying on this opinion, she took no further steps, and some years later she was informed by her father of the fact, to which allusion has already been made, that he too

had sought an opinion as to its validity. These two opinions concurring, no other advice was taken until in the spring of 1890, when the deed and the circumstances attending its execution were laid before the distinguished solicitors, who filed the bill and argued this case in her behalf; and then for the first time Mrs. Whitridge was informed that the deed was open to assault in a Court of equity. The bill was promptly filed. Long lapse of time, if unexplained, may raise a strong presumption of acquiescence, and may be sufficient to induce a Court of equity to refrain from interfering with a transaction to which all or nearly all the original parties are dead. In such instances, as remarked by Mr. Chief Justice FULLER, in *Hammond vs. Hopkins*, 143 *U. S.*, 274, "the hour-glass must supply the ravages of the scythe." But acquiescence always presupposes that the party sought to be bound by it understood the act done, and was apprised of his legal right to question or impeach it. In *Pairo vs. Vickery*, 37 *Md.*, 486, it appeared that Samuel C. Edes devised and bequeathed the whole residue of his estate to Thomas J. Carson, in trust for certain purposes, during the life of the testator's mother. That he then, upon her death, gave this residuum, discharged of the trusts, to his brother and two sisters—Mrs. Pairo being one of the latter. That Mr. Edes died in January, 1865, and that in April, 1865, Mrs. Pairo and her husband conveyed by way of mortgage the whole of her interest in her brother's estate to Mr. Carson, the trustee, to secure the payment of a debt due to Carson, by Mrs. Pairo's husband. That Mrs. Edes the mother of the testator was then living, and that Carson held the property under the will as trustee. Carson died in 1869, and in 1870 Mrs. Pairo filed a bill to annul the mortgage. Among the defences relied on was that of *laches*. This Court struck down the mortgage upon the broad principle that Courts of equity will

not uphold such transactions between trustee and *cestui que trust*, unless it clearly appears that they are free from all taint or suspicion of unfairness. In disposing of the question of delay the Court said: "The delay in filing the bill is explained by the fact that the appellant was not informed of her legal right to impeach the mortgage until May, 1870, when for the first time she had the benefit of legal advice." Carson had died before the bill was filed, just as Mr. Graham, Mrs. Brown, George S. Brown and David M. Perine died before the pending bill was filed; but this Court said of Carson's death (and the observation is equally applicable to this case) "we lay less stress upon the circumstance of his death, because the invalidity of the transaction impeached, depends mainly on the relation of the parties to each other and the intrinsic nature of the transaction itself as disclosed on the face of the mortgage, rather than upon any extrinsic circumstances." * * * * * "The mere lapse of time, and the death of Carson, are not of themselves sufficient to bar her claim; and having instituted her suit without delay after being informed of her rights, we are of opinion, that she is entitled to relief." The *dictum* of Lord Chancellor ERSKINE in *Morse vs. Royal*, 12 *Ves.*, 374, is equally to the point. "As to the effect of the length of time, where there is no bar by the Statute of Limitations, a Court of equity will never lay down as a general proposition, that though the fact, that imposition has been practiced, is established, the party is too late; and by the accident of the death of the person who might have contradicted him, shall be deprived of his right to relief."

The delay in assailing the deed has been satisfactorily explained as already pointed out; and as Mrs. Whitridge was ignorant of her right to impeach the transaction until but a few weeks before the proceedings were commenced, she cannot be held to have acquiesced in the wrong and injustice to which she had been subjected.

Whitridge *vs.* Whitridge, *et al.*

The deed of November the ninth, 1876, must, for the reasons we have given, be set aside and vacated. As a consequence, the decree of the Circuit Court of Baltimore City sustaining that deed must be reversed, and the cause must be remanded, that another decree conforming to this opinion may be passed—the costs in both Courts to be paid out of the trust estate.

*Decree reversed and cause remanded, the costs in both Courts to be paid out of the trust estate.*

(Decided 7th June, 1892.)

Judges ROBINSON and BRYAN dissented, and Judge BRYAN filed the following opinion:

I have very carefully studied this case, and have also read with great attention the opinion of his Honor Judge PHELPS.

I do not think that Mrs. Whitridge is a competent witness in any aspect of the case. And I do not think that it is competent for her to assail her own deed, after an acquiescence of fourteen years, and after the decease of all the actors in the transaction whose conduct is now impeached.

Without elaborating my views, I consider it sufficient to say that I entirely concur in the able opinion of the learned Judge who decided this cause in the Circuit Court. His conclusions are based on grounds of argument and authority which are impregnable. I adopt them in their full extent, and think it needless to attempt to add anything to them. His opinion will be published in our Reports.

(Filed 11th June, 1892.)