EDWARD I. MYERS, ET AL. *v.* G. FERDINAND
MYERS, ET AL.

[No. 8, October Term, 1945.]

*Decided November 8, 1945.*

*Dissenting opinion filed November 14, 1945.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, HENDERSON, and MARKELL, JJ.

*H. Kieffer DeLauter* and *Holden S. Felton* for the appellants.

*Benjamin B. Rosenstock,* with whom was *E. Austin James* on the brief, for the appellees.

DELAPLAINE, J., delivered the opinion of the Court.

In this suit G. Ferdinand Myers, Mary G. Loy, A. Rebecca Hahn and Russell E. Myers prayed the Circuit Court for Frederick County to annul five deeds of real estate, which their mother, Mary E. Myers, deceased, had given to their brother, Edward I. Myers, and his wife and children. The chancellor declared the deeds void on the ground of undue influence, and the grantees are appealing from the decree.

It appears from the record that the mother, upon the death of her husband, George Edward Myers, in March, 1941, became sole owner of her home on East Third Street in Frederick and also fourteen small rented houses. She named her son Edward, who lived nearby, to act as her agent to settle the estate and to attend to the houses, inasmuch as Ferdinand was located in Baltimore and Russell in Ohio. When it was found that his father and mother had endorsed promissory notes for about $6,000 for Mary and Rebecca, Edward instructed the banks to notify them that their mother would not endorse any more renewal notes. Offended by the notices, they refused to visit their mother, who was 74 years old and entirely alone. She then invited Edward and his family to live with her, and he expressed a willingness to buy the parental home at the assessed value. His sisters, however, objected and threatened to run up the price so that he could not buy it. On hearing this, Edward said to his mother: "If that is the way they feel about it, I will come, and the Hell with them all!" Even before he and his family moved in, his mother determined that the son and daughter-in-law who lived with her should inherit the home. As

her husband's attorney thought it would be advisable to postpone making a will on account of the stress of circumstances at that time, she retained William M. Storm, attorney, who prepared a deed conveying the home to Edward and his wife, subject to her life estate. The deed was executed and recorded on August 1, 1941. Edward and his family moved into the home during the month of August. Several months later Russell warned his mother from Ohio that his sisters were planning to file suit against her to declare her incompetent to handle her own affairs, but that he would remain loyal to her as long as she lived. She determined to resist the suit and also to make disposition of her other houses. She went unaccompanied to Mr. Storm's office with a list of her houses, from which he prepared four deeds, one giving three houses, assessed at $1,085, subject to her life estate to Russell, the other three conveying houses, assessed at $14,360, subject to her life estate, some to Edward and his wife, the others to their children. The deeds were executed February 24, 1942, and were recorded on March 5, 1942.

On May 1, 1942, Ferdinand, Mary and Rebecca filed their bill of complaint alleging that their mother did not understand the deeds and had been induced to sign them by Edward's domination and influence. The bill prayed the Court (1) to annul the deeds, and (2) to appoint a trustee to carry out her husband's wish that she seek the advice of his friend, Horace C. Zacharias, of Frederick, in the management of her estate. She appeared in court and emphatically denied the charges, explicity declaring: "Edward did not know one earthly thing. * * * I had not been influenced by any one." On October 1, 1942, the chancellor dismissed the bill, holding that the evidence proved beyond doubt that Mrs. Myers was of sound and disposing mind and capable of making a valid deed or contract. The trial served only to intensify her indignation. When one of her daughters sent her flowers for Christmas, she replied that the Court might bring her back for perjury.

In September, 1943, the daughters planned a different course of action. Through a mutual friend as intermediary, they sought a reconciliation with their mother. At the friend's home they were greeted by her with affection. Soon afterwards she left the home where she had been living about 50 years; ordered her furniture moved out of the house; employed her daughters' lawyer; notified Edward to pay rent; requested him to deed the house back to her; and notified him through the sheriff to quit the premises. In view of the positive testimony in Court in 1942, she was obviously unable to return to Court to attack her deeds on the ground of undue influence; but her lawyer drafted a deed of trust alleging that she had been induced to execute the deeds in 1941 and 1942 by imposition practiced upon her by Edward and Russell, and attempting to convey all of the properties which she had already conveyed, pledging that if Edward and Russell would convey their houses to the Farmers and Mechanics National Bank as trustee, then after her death the trustee would equally divide her estate among her children. She executed this instrument on March 29, 1944, and it was recorded on April 24, 1944. Russell accepted the proposition; Edward declined it. Mrs. Myers died on April 26, 1944, and the four children subsequently instituted this second suit to set aside the deeds.

Ordinarily, in the relation of parent and child, the parent occupies the dominant position, but where the natural position is reversed by the influence of time, so that on account of old age and feebleness the parent relies heavily upon the child for care and protection or for guidance in business affairs, then the child becomes the dominant party; and if the parent makes a gift to the child, it will be held void unless it is shown by the grantee to the satisfaction of the Court that it was free and voluntary and the transaction was a fair and proper one. *Upman v. Thomey,* 145 Md. 347, 125 A. 860; *Mead v. Gilbert,* 170 Md. 592, 185 A. 668; *Gerson v. Ger-*

*son,* 179 Md. 171, 20 A. 2d 567; *Gaggers v. Gibson,* 180 Md. 609, 26 A. 2d 395; *Williams v. Robinson,* 183 Md. 117, 36 A. 2d 547; *Grimes v. Grimes,* 184 Md. 59, 40 A. 2d 58. There is no question that the relation of principal and agent is confidential where the agency includes the management of all the business affairs of the principal; and when a gift or other benefit is obtained by the agent and the principal afterwards alleges that it was obtained by the exercise of undue influence, the burden is on the agent to show the *bona fides* of the transaction. *Brown v. Mercantile Trust & Deposit Co.,* 87 Md. 377, 390, 50 A. 256; *Thiede v. Startzman,* 113 Md. 278, 287, 77 A. 666. In the case before us the mother named her son as agent to attend to her properties and advise her in business affairs, and reposed confidence and trust in his judgment and integrity. Therefore, they stood in a confidential relation, and the burden was on the defendants to show that the transaction was fair and that the confidence was not abused.

This case does not come within the class of the great majority of cases where the grantor's mental and physical infirmity makes him easily susceptible to influence. In *Cherbonnier v. Evitts,* 56 Md. 276, for example, the grantor was helpless from senile dementia. Likewise, in *Gaggers v. Gibson,* 180 Md. 609, 26 A. 2d 395, the grantor was 86 years old and very feeble. Here we have no question of mental capacity. The chancellor found that Mrs. Myers was fully competent to handle her affairs. While he said that he did not pass on the issue of undue influence in the first case, nevertheless it is obvious (1) that the grantor possessed unusual physical vigor for a person of her age, taking an automobile trip to Ohio after she had executed the deed in 1941, (2) that she had a strong will and determination, and (3) that she had the benefit of independent advice and fully understood the nature and effect of the instruments. In Maryland independent advice is not essential to the validity of a conveyance between parties occupying a confidential relation. *Todd v. Grove,* 33 Md. 188, 195; *Zimmer-*

*man v. Frushour*, 108 Md. 115, 69 A. 796; *Williams v. Robinson*, 183 Md. 117, 36 A. 2d 547, 550. However, the question whether or not a donor of property where undue influence is alleged received disinterested and competent advice is a material question to be considered with other surrounding circumstances. *Gaggers v. Gibson*, 180 Md. 609, 26, A. 2d 395; *Hawkins v. Gray*, 128 Ark. 143, 193 S. W. 509.

In the present case there is not a particle of evidence of persuasion. The grantor herself swore in the Court below that at no time did Edward request or advise her to make any of the deeds now under attack. When specifically asked whether or not she had executed the deeds of her own free will, she declared: "Of my own free will. No one knew anything about it. * * * Finally I made up my own mind, and the next day I called up Mr. Storm and told him I wanted to see him." It is clear that the deeds were free from undue influence, and were the result of the desire of the grantor to give her property to those she felt were closest to her, and were not the result of abuse of her confidence. Therefore, the defendants sustained the burden of proof placed upon them by reason of the confidential relationship existing.

It is a basic right of every person of sound mind to make any disposition of his property that he desires not inconsistent with the law. *Kennedy v. McCann*, 101 Md. 643, 61 A. 625; *Chase v. Grey*, 134 Md. 619, 107 A. 537. His motive may be love and affection, gratitude, partiality or prejudice, or even whim or caprice. *Burnett v. Smith*, 93 Miss. 566, 47 So. 117. Whether a certain disposition of property is just or unjust in its provisions is not a question for the Court. There is no rule of law requiring a parent to distribute his property equally among his children, or authorizing a court to annul a disposition merely because it appears to be unjust to one or more of them. He may prefer one and disinherit another with or without reason, or he may disinherit all his children and give his estate to a

stranger. *Meyer v. Jacobs,* C. C., 123 F. 900, 909. Of course, where the issue is mental capacity, fraud, or undue influence, the fairness or unfairness of a gift may be considered in connection with other evidence in determining whether the reason given for disposing of the property is so flagrantly unjust as to lead to the conclusion that the conveyance was not fully understood. *Green v. Michael,* 183 Md. 76, 36 A. 2d 923, 927. But the feeling of affection and gratitude which inspires a parent to make a gift to a child is a natural and proper influence. *Blochowitz v. Blochowitz,* 122 Neb. 385, 240 N. W. 586, 82 A. L. R. 949. It is perfectly reasonable to expect that a parent will reward the son or daughter who stands loyally by him. Therefore, when a parent makes an unequal or unjust distribution of his property in order to favor those who ministered to his needs and contributed to his comfort, the distribution will not be set aside unless it was procured by fraud, undue influence, or imposition. *Sears v. Vaughan,* 230 Ill. 572, 82 N. E. 881, 887; *Brugman v. Brugman,* 93 Neb. 408, 140 N. W. 781; *Mackall v. Mackall,* 135 U. S. 167, 10 S. Ct. 705, 707, 34 L. Ed. 84.

The doctrine of constructive fraud has been formulated to protect the grantor in a confidential or fiduciary relationship, not against his own voluntary and deliberate judgment which may have been the result of resentment, favoritism or whim, but against overweening confidence and precipitate judgment. *Brown v. Mercantile Trust & Deposit Co.,* 87 Md. 377, 390, 40 A. 256. In this case the widowed mother conveyed the vested remainder in her home to her son and daughter-in-law in 1941, while they were making arrangements to move into the parental home to care for her in her declining years, after it was found that none of her other children would live with her. Then in 1942, while she was being harshly condemned and threatened with a law suit by the others, Edward was collecting the rents from the houses, while his wife was working as housekeeper; so that again they became worthy of her bounty. In plan-

ning to favor those who had treated her with filial consideration and kindness, the mother deliberately decided to make final disposition of her properties while she was still living, so that in the event any of her other children complained she could meet them in Court and have the complaint settled while she was still living. At the trial of the first case in the Court below, she quoted Mr. Storm, her attorney, as advising her: "If that is what you want to do, do it now. Do it while you got your eyes open, so that you can defend yourself and speak for yourself." It was admitted by Mr. Storm that he told her: "I have three children. If they don't treat me right, I am under no obligation to leave them anything."

The chancellor, in declaring the deeds void stated that Edward had gained the favor of his mother by being shrewd and selfish in stirring up discord between her and his sisters, and that he should not be allowed to take any advantage from his own wrong. It is true that where a gift is obtained by fraud, undue influence, or imposition exerted by the donee, the donor may recover it on the principle that no man should be permitted to secure any benefit from his own wrongful act. *In re Anderson's Estate,* 157 Or. 365, 71 P. 2d 1013, 1017; 38 *C. J. S., Gifts,* Sec. 34. But in this case there is no allegation of fraud, no evidence of unfair persuasion, and no imposition. In each deed the grantor reserved a life estate, and we do not find the gifts were improvident. There were, to be sure, some disputes in the family from time to time. Mrs. Myers, however, attributed the start of the trouble to the promissory notes, and she declared that she had promised her husband that she would not sign any more notes after his death. Moreover, it was Edward's duty as agent in the settlement of his father's estate in the Orphans' Court, to notify his sisters in regard to the notes. Another dispute arose over burial rights in the family cemetery lot. But we do not consider the evidence as sufficient to show that Edward was guilty of such wrongful conduct as to vitiate

his mother's deeds, which had been executed and recorded several years prior to her death.

While a gift made by a person liable to be imposed upon by another will be scrutinized with vigilant suspicion, especially when the gift is improvident, the Court should never set aside a conveyance merely on the ground that it is such as a wise man would not have made or as a man of high honor would not have accepted, even though the donor has stripped himself of his property. For, as Justice Story said, courts of equity "do not sit, or affect to sit, in judgment upon cases as *custodes morum* enforcing the strict rules of morality." 1 *Story Equity Jurisprudence*, 12th Ed., Sec. 308; *Williams v. Robinson*, 183 Md. 117, 36 A. 2d 547, 549. Justice Holmes has observed that there are certain things which the law allows a man to do, although he foresees that harmful consequences to another will follow from them but nevertheless works with malevolent intent to produce them. Thus, for a specific instance, a man "may establish himself in business where he foresees that the effect of his competition will be to diminish the custom of another shopkeeper, perhaps to ruin him." *Holmes, The Common Law*, 144, 145.

Accordingly, whether the defendants should convey some of their properties to their relatives in a spirit of magnanimity is not a question for the Court to decide. The situation is somewhat like that in *Longenecker v. Zion Evangelical Lutheran Church*, 200 Pa. 567, 50 A. 244, 247, where an aged woman made a voluntary gift to the church and later wanted it returned, and it was held that, since there was no evidence of undue influence, it was not for the Court to say whether the church would be constrained by Christian ethics to return the gift to the giver and remove itself from the suspicion of having "reaped the fruits of an old woman's whim, turned so quickly to regret." While a voluntary conveyance is void as against existing creditors, and a good consideration of blood or natural love and affection is not sufficient for an executory contract, such a consid-

eration is sufficient to support a gift where the donor's title and control are transferred absolutely, and the conveyance is binding as against the grantor and his heirs. It is also well settled that a vested remainder is a present, fixed right to future enjoyment, and is an estate which the owner can convey or devise or which descends in case of intestacy to his heirs. *Snyder v. Jones,* 99 Md. 693, 59 A. 118; *Miller, Construction of Wills,* Sec. 215. We hold that when a person voluntarily conveys property by deed valid and absolute on its face and duly recorded, without fraud, undue influence, or imposition exerted upon him, the Court has no authority to nullify the deed merely because he later changed his mind and regretted the conveyance. *Allen v. Safe Deposit & Trust Co.,* 177 Md. 26, 7 A. 2d 180; *Williams v. Robinson,* 183 Md. 117, 36 A. 2d 547, 550.

As the deeds in this case were irrevocable gifts *inter vivos,* and the evidence proved beyond doubt that the grantor was not induced to execute them by undue influence, we have no other course than to reverse the chancellor's decree.

*Decree reversed, and bill of complaint dismissed, with costs above and below to the appellants.*

MARKELL, J., filed the following dissenting opinion:

After fifty years of married life Mrs. Myers became a widow on May 11, 1941. She died April 26, 1944. Throughout the three years of her widowhood she was the center of maneuvers and controversy among her five children about her property. The children quite lost sight of the fact that she was (and they were not) the owner of her property. This blindness to her existence, manifested in strange behavior, led to strange legal procedure. Four of her children (the plaintiffs in the instant case) on May 1, 1942, filed a bill to set aside, on the ground of undue influence her deeds to Edward and his wife and children. In effect, they thus asserted

ownership of her property in her lifetime. *Cf. Sellman v. Sellman,* 63 Md. 520, 522-525; *Upman v. Thomey,* 145 Md. 347, 361, 125 A. 860.

The same error permeates and confuses the instant case. The plaintiffs sue in their own names, without stating whether they claim under the deed of trust to the bank or against that deed, or whether Mrs. Myers died testate or intestate, and without making either the bank, as trustee, or her devisees (if any) parties. Such a suit can only be maintained in her right, by her successors in right.

In charging undue influence but not fraud, the plaintiffs charge too much and too little. In the absence of fraud or a confidential relation, the burden of proving undue influence over a person of sound mind is a heavy burden. In this case evidence of fraud is not wholly lacking. But, in view of the confidential relation between the mother and Edward, it is not necessary for the mother (or those suing in her right) to prove actual fraud or actual exercise of undue influence. The burden is upon the defendants to show that (a) the gifts were free and voluntary, untainted by fraud or undue influence and (b) the transactions were fair and proper ones. *Upman v. Thomey,* 145 Md. 347, 360, 361, 125 A. 860; *Tracey v. Tracey,* 160 Md. 306, 318, 321, 153 A. 80; *Highberger v. Stiffler,* 21 Md. 338, 353, 354, 83 Am. Dec. 593, quoting Story.

The defendants have not sustained either burden. The gifts were not untainted by fraud, and the transactions were not fair or proper. Mrs. Myers was deceived by Edward (1) (like King Lear) by the pretense that he "loved her most" and (2) by actively poisoning her mind against the plaintiffs.

In the 1942 case she testified: "I was going to deed Edward my home. I was going to do for the ones that had done for me. And Edward and his family have been wonderful to me, and their children, they can't do enough for me." After she became reconciled with her daughters in September, 1943, and left Edward and went

to live with Mary, Edward did not go to see her. Her last illness lasted six days; the last three days she was in the Frederick hospital. Judge Woodward, who heard both cases, aptly says: "When Mrs. Myers became sick, Edward was told of her illness and, although every facility and inducement were offered by Mr. Loy, he refused to go to see her. He was informed that she was in the hospital but did not go to see her. The evidence covering the period of her illness discloses a callousness hard to believe in a son who had been given most of her realty, and conclusively shows that the surpassing love and affection that she thought he had for her did not exist to the degree that she had been led to believe."

Soon after his father's death Edward went to the banks and instructed them to notify his sisters that their mother would not endorse any more renewal notes for them. He then went to his mother and said: "Mama, the bank sent me home to tell you you are not to sign any more notes." This double-dealing worked. She testified that at one time she thought all her children loved her equally, "but now I don't. * * * After their father's death, and these notes came up, there was a change. * * * The notes changed everything."

There was, however, no breach at that time. Mother and daughters did not cease to visit each other until after she had made the trip to Ohio and back in August and Edward had moved in from across the street. Meanwhile, on one occasion, Mrs. Myers was present "when Ed told his sister she was a liar." Just before Mrs. Myers left for Ohio she spent the week-end with Mary.

At Edward's suggestion, Mrs. Myers asked Mary and Rebecca each to come and live with her. Each gave reasons, apparently substantial, relating to her husband's business, why she could not do so. When Mrs. Myers told Edward what they had said, he said, "If that is the way they feel about it I will come, and the Hell with them all." This benediction was pronounced some time before the family meeting at which Edward's proposal to buy the home was discussed.

At Christmas, 1942, Mrs. Myers acknowledged Christmas remembrances from Fred (Ferdinand), Mary and Rebecca by letters in which she said (referring to the 1942 case): "You all lied to help yourselves out. The Court considered bringing you all back into court for perjury." The poison in this statement, which has no foundation in the evidence or in Judge Woodward's opinion, evidently emanated from Edward.

Mrs. Myers was 74 when her husband died. She was in good health. She had no reason to assume that she would live only three years and would be ill or helpless only six days before her death. She testified: "I have plenty to keep me as long as I live." She could not have so testified if she had understood the legal and economic effect of her deeds to Edward and his family.

By those deeds she stripped herself of all her real estate, reserving only a life estate and no power of revocation. With the exception of whatever remained of $7,300 of life insurance proceeds, the realty was substantially her entire estate. It was assessed at $18,000; what income it produced is not shown. No doubt she was accustomed to thrift. While health and strength permitted her to care for herself, she might have maintained herself alone on the income from $18,000. But after her husband's death she "had lived four weeks alone and couldn't make it." She could not assume continued health and strength. Out of the income from $18,000 she could not have afforded a domestic servant, to say nothing of nursing, medical and hospital expenses. In such circumstances a prudent trust company would not accept a trust without advising a reserved power of revocation or a special power to use *corpus* if necessary.

It is said that Mrs. Myers had the benefit of independent advice and fully understood the nature and effect of the instruments. She had no advice at all concerning her own legal rights and interests, as an individual. The only advice she received was advice about her status as a partisan in the controversy among her

children. In the 1942 case the same counsel represented her and Edward. The difference between a will and a deed, and between a revocable and an irrevocable deed, were never explained to her. On the contrary, in stripping herself of all her property in February, 1942, she acted on misunderstood or mistaken advice in this respect. As this Court says, "the mother deliberately decided to make final disposition of her properties while she was still living, so that in the event any of her other children complained she could meet them in Court and have the complaint settled while she was still living." This is exactly what she could not do; in the untimely 1942 case the complaint could not be, and was not, settled. *Sellman v. Sellman, supra; Upman v. Thomey, supra.* The fact that "if my children don't treat me right, I am under no obligation to leave them anything," is no reason for stripping myself of my property by an irrevocable deed; quite the contrary.

The absence of a power to revoke a voluntary settlement or trust is viewed by courts of equity as a circumstance of suspicion, and very slight evidence of mistake, misapprehension, or misunderstanding on the part of the settlor will be laid hold of to set aside the deed. *Lambdin v. Dantzebecker,* 169 Md. 240, 245, 181 A. 353; *Coutts v. Ackworth,* L. R. 8 Eq. 558, 564, 567; *Phillips v. Mullings,* L. R. 7 Ch. 244, 247. In the case of a drunkard or a spendthrift who desires to protect his wife and children against his own extravagance—or a wealthy man who desires to save taxes by parting with his property—a power of revocation would defeat the object of the settlement. But in the now common case of a widow with a small estate and an uncertain and inadequate income, the absence of such a power makes the transaction unfair and improper. In *Whitridge v. Whitridge,* 76 Md. 54, 72, 24 A. 645, 650, this Court said, of an irrevocable deed of trust executed between parties in a confidential relation, "The deed contains no power of revocation. * * * In a word, she has been deprived of all control over her property, and has been reduced by the

deed to the position of a mere annuitant upon her own estate." In the circumstances, this disposition was declared to be "highly improvident." 76 Md. at pages 83, 84, 24 A. 645. See also *Thiede v. Startzman,* 113 Md. 278, 291, 292, 77 A. 666. In the Whitridge case the annual income probably exceeded $18,000, and there was then no income tax. In the Thiede case the annuity of $900 was probably more—certainly more in purchasing power —than the income from $18,000 in 1942.

"Nothing can tend more to produce confusion and inaccuracy in the discussion of the subject than the treatment of actual undue influence and fiduciary relations as though they constituted one and the same doctrine." *Pomeroy, Equity Jurisprudence,* 5th Ed., Sec. 955. In the instant case the Court states two opposite doctrines, (1) the doctrine of fiduciary relations, and (2) the law of undue influence, in the absence of fraud or fiduciary relations. The former doctrine is held applicable; but the latter is applied, most rigorously, with mention, by analogy, of common law rights (if they be rights) to ruin a competitor, or to "reap the fruits of an old woman's whim, turned so quickly to regret," or to accept a conveyance "such as a wise man would not have made or as a man of honor would not have accepted." (*Huguenin v. Basely,* 14 Ves. Jr. 273, 387.) I can find no case in which any such right, in favor of a fiduciary against a trusting mother or other person, has been recognized by a court of equity.

After the confidential relation between Mrs. Myers and Edward came to an end, a similar relation apparently was soon established betwen her and her other children—with the same result. Again she purported to convey all her property irrevocably, this time in trust for the four children.

Neither Edward nor the other children have sustained the burden of showing that the conveyances to them were fair and proper. The evidence shows that all these conveyances were unfair to Mrs. Myers and improper. They were all moves in a contest among the children,

made without regard for the interests or needs of Mrs. Myers herself and without understanding by her of her own interests or needs.

This case should be remanded for amendment of the bill and for addition of new parties, if necessary. On the present evidence all the deeds, including the deed of trust, should be set aside and the properties should revert to Mrs. Myers, *i.e.*, to her heirs or devisees, as the case may be.