# VIRGINIA (JENNIE) BENEDICT, ET AL. *v.* FRANK W. WAREHIME

[No. 3, October Term, 1946.]

*Decided October 30, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Theodore F. Brown* for the appellants.

*F. Neal Parke* for the appellees.

MARBURY, C. J., delivered the opinion of the Court.

This case involves the validity of the transfers of five bank accounts made by the late John W. A. Warehime, of Carroll County, during his lifetime. He died a child-less widower on April 1, 1943, at the age of 81 or 82 years. On January 20, 1943, he transferred an account

in the Westminster Savings Bank of $1,137.46, and an account in the First National Bank of Westminster of $3,355.89, and an account in the Farmers and Mechanics National Bank of Westminster of $2,523.62, all of which had been in his name, to the usual trust form for himself and his brother, Frank W. Warehime, joint owners, subject to the order of either, the balance at the death of either to belong to the survivor. The account at the First National Bank seems to have been a checking account. The others were savings accounts. On February 10, 1943, Mr. Warehime similarly transferred his savings account in the Birnie Trust Company at Taneytown amounting to $2,321.98. He also had an account in the Union Mills Savings Bank of $2,563.96, but this remained in his individual name. He left a will in which his brother, Frank W. Warehime and A. Earl Shipley were named as the executors. By the terms of this will he gave to his brother, Frank, and to his sister, Virginia (called Jennie) Benedict, one of the appellants, each the sum of $3,000, which he stated represented an equal division of the sum he inherited from his parents. He then gave to Carrie V. Koontz, a sister of his deceased wife, 40 shares of stock in the Farmers Fertilizer and Feed Company. He then stated that he considered the balance of his estate was accumulated by his wife and himself during the period of their joint lives, and he directed his executors to dispose of his property and after payment of the costs and expenses of his estate to distribute the proceeds $1,000 to Krider's Reformed Church, one-half of the balance then remaining to be divided equally between the brothers and sisters of his deceased wife, who might be living at the time of his death, and the other one-half of the balance to be divided equally between his brother and his sister, Jennie. He also stated he was paying his sister-in-law, Carrie V. Koontz, for her services as his housekeeper, and she should therefore have no charge against his estate for any services rendered for him. This will had been made on January 3, 1942, which was about five months after his wife died.

The executors received letters testamentary from the Orphans' Court of Carroll County and reported the four accounts above mentioned as having been validly transferred to and as being the absolute property of Frank W. Warehime, and he paid the collateral taxes imposed on such transfers. They subsequently stated an administration account, and did not include these deposits among the assets of their testator's estate. After all this had been done and on July 25, 1944, Virginia Benedict (called Jennie in the will), sister of Mr. Warehime, and Oliver M. Koontz, brother of Mrs. Warehime, filed their petition asking that the four transferred deposits be included as a part of the estate. This petition was answered by Frank W. Warehime as executor and individually and two issues were sent by the Orphans' Court to the Circuit Court for Carroll County for trial. These issues were, first, whether Frank Warehime concealed any part of the estate of John W. A. Warehime, and, second, whether Frank Warehime by misrepresentation, deceit or fraud or by the use of duress, or by undue influence, obtained and converted to his own use any of the sums on deposit in each of the four banks in which the accounts were transferred, as above mentioned. At the trial of the case the jury answered both issues "yes." The defendant, Frank W. Warehime, individually and as executor, had moved for a directed verdict. The court instructed the jury that there was no evidence to prove that the transfers were made as the result of misrepresentation, deceit or fraud, but reserved its decision on the questions of duress and undue influence. The defendant made a motion *n. o. v.* after the verdict. The court granted the motion, and directed that the issues be answered "no" instead of "yes." From this order of the court, the appeal comes here.

The testimony relied on by the appellants is, first, that John Warehime told his next-door neighbor, Mr. Arthur, a former Register of Wills of Carroll County, and a man of 88 years of age at the time he testified, that he was thinking of making a will, that he was going to give his

sister and brother the money he got from his home, which he had inherited from his father, and the rest of his estate he was going to divide between his family and the family of his deceased wife, because he thought his wife had earned as much of the money as he had. About two weeks later he said he had been thinking it over, and he thought he would give his wife's sister, Carrie, who was taking care of him as his housekeeper, "a little special." This witness said also that Mr. Warehime had broken after his wife died, physically and mentally, that six months before he died he was a broken, tottering old man, but that he attended to his business generally. Within six months of his death the witness noticed that Mr. Warehime was getting confused in his mind. He explained this by saying that in talking with him he would get off the subject and would never get back on it again. He also said that he saw him stand and cry several times, but he did not know what it was about. Another witness, this one 77 years of age, who was a first cousin, and who had been a judge of the Orphans' Court of Carroll County, testified that Frank Warehime came over and took John Warehime away in his car two or three times on a Wednesday, in the afternoon, but he didn't know the dates or how often it was. This was corroborated by the wife of this last witness, who said she saw them four or five times on a Wednesday. Carrie V. Koontz, the housekeeper, on Wednesdays went to a sewing society at Krider's Church, and this last testimony was offered to show that the brother took John Warehime away on those days on which Miss Koontz was not at home. The evidence further shows that the two dates on which the transfers were made were both Wednesdays. Miss Koontz testified that Mr. Warehime talked to her in December on a Saturday about his will, and burst out crying. She did not go with him when he made his will. She said he was failing in the last year, having spells and getting confused. She said she was home on the Wednesday afternoon of the 10th of February and saw Frank Warehime come and take John Warehime

away. She also said that after they saw him on Wednesdays, he would become nervous and start to cry, and it would take him until the first of the week to get straightened out again. Once when they came back, she heard Frank Warehime say, "Put Miss Carrie's name on it." She also said that after John Warehime's death, Frank asked her whether he had a will. She answered "yes," and he said, "who is on it," and she said "you and Mr. Shipley." Frank said he didn't think his brother would put him on it because he drove him around and couldn't get a thing out of him. After the will was read, Frank asked her if she were satisfied, and said the Farmers Fertilizer stock should have been his. About a week after the funeral Frank came to see her and she asked him how his name got on the bank accounts. He said, "Just as sure as God lets me stay on this planet I did not own any bank account." She said that his name was on the bank books, that "it is no use to lie, he knew better." He then said, "If he also had the chance to drive around with him and with his wife, whether he wouldn't have taken that chance. Mr. Frank (meaning Frank Essich) would have done that. If Nealey (meaning Mrs. John Warehime) was living." The appellants made a motion to correct the record as to this statement, so as to clarify it and their version of the testimony is, "Well, if Gust (meaning John Warehime) had died first and Frank Essich had had a chance to haul Nealey around, what would he have done." The court refused this motion, but it does not seem to make the alleged statement any stronger from the appellants' point of view. The witness also testified that Calvin E. Bankert, the treasurer of the Union Mills Savings Bank, who fixed John Warehime's income tax told her that Frank's name was on the books. She could not tell when that statement was made. She thought it was the year before John Warehime died. The plaintiffs also called a Mr. Richardson, who bought Mr. Warehime's farm in August, 1941, immediately after the death of his wife. He saw him weekly, from that time until the time of his death. He

said that he was failing, his mental and physical condition were both failing, but there wasn't anything impressive about it, except that he was growing old and that he was a little hard to talk to, and a little deaf.

The treasurer of the Birnie Trust Company, called by the plaintiffs, testified that on Wednesday the 10th of February, 1943, John Warehime came into his bank, sat down in a chair in the directors' room, said he wanted to change his bank account from his own name to the name of himself and his brother, because, he said, Frank was his only brother and he wanted him to have the money. This was done and the new bank book handed to Mr. Warehime. The bank official then asked Mr. John Warehime if Mr. Frank Warehime was along, and he said "yes, he had brought him up in the car." The bank official then asked to have Mr. Frank Warehime come in and sign the signature card, and this was done. The assistant treasurer of the Westminster Savings Bank, testifying for the plaintiff's, said that on Wednesday, January 20th, John Warehime came into his bank and the transfer was made in the directors' room. Frank Warehime was not there, but John Warehime told him how he wanted it made out. The cashier of the First National Bank, called by the plaintiffs, testified that on January 20th John Warehime came in and said he wanted to take the money out of the name in which it was and put it in his brother's name and his, that he was obliged to his brother who did things for him and he wanted to show his appreciation in that way. He did not see Frank Warehime around at the time. The transaction was completed with John Warehime. The cashier of the Farmers and Mechanics National Bank of Westminster testified for the plaintiffs that John Warehime came to his bank on January 20, 1943, and said he wanted to make his account joint with Frank Warehime. That he did not see Frank Warehime on that occasion.

The aggregate amount of the estate in the Orphan's Court was $34,500 and some odd dollars, and the expenses were a little over $3,000, which allowed a net

amount for distribution of $31,000. The balance for distribution among the relatives of John Warehime and the relatives of Mrs. John Warehime was $22,900, one-half of which was divided among six brothers and sisters of Mrs. Warehime and the other one-half was divided between Frank Warehime and Mrs. Benedict, the brother and sister of Mr. Warehime.

There was also another witness who testified that during the last six months of his life John Warehime was tottering and forgetful, and had lost, to some extent, the sight of one eye. A nephew of John Warehime was also called by plaintiffs. He said that his uncle was getting tottering, it was very hard to make him understand in the fall before he died, and he was just about as an old man would get, that was all he noticed.

Mr. Frank Warehime, who was 74 years old, denied he had said what Miss Koontz stated about Frank Essich, that he would have done the same things, or words to that effect. He also said he had never said anything about putting Carrie's name on any thing, and that he did not deny having his name on Mr. Warehime's bank books. He was, of course, limited in his testimony by the evidence act.

It may be well, at the out-set, to state that this is a case in which there is no question of confidential relations between John Warehime and his brother. John Warehime attended to his own business, looked after his own affairs, and in no sense ever depended upon his brother, so far as the record shows, for any financial or business advice or assistance. The only assistance ever given him by his brother was taking him out in the latter's car after he was unable, by reason of age or bad eyesight, to drive his own. The evidence of a confidential relationship would at once raise an equitable presumption against the validity of any transaction between the parties, and the burden would be upon the brother to show that what was done was equitable and fair, and that there had been a full disclosure of all the relevant facts. We had occasion recently to pass upon

such a case in which it was held there was a confidential relationship, but, nevertheless, the conveyances attacked were made under circumstances which did not justify their being avoided. This was the case of *Myers v. Myers,* 185 Md. 210, 44 A. 2d 455. There is also a discussion of the general subject in the case of *Owings v. Currier,* 186 Md. 590, 47 A. 2d 743. The principle involved was expressed by Lord Hatherley in the leading English case of *Tate v. Williamson,* L. R. 1. Eq. 528, in the following words: "The broad principle on which the court acts in cases of this description is, that wherever there exists such a confidence, of whatever character that confidence may be, as enables the person in whom confidence or trust is reposed to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with the person so trusting him."

Where no confidential relationship exists the burden is upon the plaintiffs to show that there was an actual duress or undue influence consciously and designedly exerted, that the party upon whom it was exerted was susceptible to that influence, and actually succumbed to it. Duress is generally used as meaning physical force or some threat, or coercion. Undue influence is some sort of mental, moral or even physical coercion which results in the fact that the act is not really that of the actor, but is that of the other party. But so long as the actor's mind is free to act and to decide upon what he does, any argument, persuasion, or even influence brought to bear upon him does not invalidate what he does if it is his own voluntary act. This last issue is the one presented in this case, and the question before us is whether there is evidence, with proper inferences from that evidence, which a jury could consider in determining whether John Warehime's actions were his own or whether his will was constrained to do what his brother wanted done. There was no evidence offered of mis-

representation, deceit or fraud, and there was no issue of mental incompetency. We will therefore pass to the consideration of what the testimony related shows as to duress or undue influence.

The mere fact that John Warehime was physically and mentally broken and a tottering old man, as described by one of the witnesses, is not sufficient to show that any duress or undue influence was exercised over him, nor is the fact that his brother took him to the banks where he made the transfers, if he did take him on both occasions. The mere fact that this happened on Wednesdays, and on that day the housekeeper was usually away, is not significant of any sinister purpose. It may, so far as the record shows, have been a day selected by the donor because on that day he would be alone. Or it may have been a pure coincidence. There is nothing in the testimony to indicate that Mr. Warehime had any coercion exercised upon him. On the contrary, the bank officials, produced by the plaintiffs, all testified that he came in by himself, stated his wishes, and in two instances gave the reasons, which were natural as exhibitions of brotherly affection and gratitude. The gifts were not immediate and outright. The donor did not strip himself of his property. He retained the pass books and the control over the accounts (with the possible exception of the checking account), until his death. He could have changed the accounts again at any time, and he could have withdrawn the money. Nor can we find in the making of the transfers any alteration or change in the general plan of Mr. Warehime's will. It is true that by making these transfers he did reduce the amounts coming to some of the residuary legatees and increased the amount which his brother received. Nevertheless, the general scheme remained in force.

It may perhaps be true that Frank Warehime paid his brother more attention than anyone else, and as a result his brother felt more warmly towards him, and in the last months of his life decided to give him more than he originally intended. There is nothing improper

about this, nor would there.be anything wrong in a request by Frank for such a gift, although there is no evidence whatever in the case that he did make such a request. The duress or influence must have constrained the will of the donor in such a way that he was no longer a free agent.

The testimony of Miss Carrie Koontz, which we must assume is correct in passing upon the judgment *n. o. v.,* contains two statements upon which the appellants rely strongly. One of them is that Frank Warehime, immediately after his brother's death, asked her whether there was a will, and when he was informed that there was was and that he was on it, he said that he didn't think the testator would put him on it because he drove him around and couldn't get a thing out of him. That statement indicates not that duress or undue influence was exercised upon John Warehime, but rather that it was not possible to exercise any, that he kept his own counsel and was not going to tell what he was going to do. The other statement is that Frank denied that he owned any bank accounts, and when he was told that this was not true, he said that if his brother had died first and his brother-in-law had had a chance to haul his brother's wife around, wouldn't he have taken that chance, or something to that effect. The most that could be inferred from this statement is that he had taken a chance in taking his brother around, and that he had in some way asked or persuaded his brother to change the accounts to his name. That does not in any way indicate undue influence. It does not indicate that John Warehime's will was impaired, or that he was not a free agent in doing what he did. Here were two old men, one 81 or 82 and the other 74, brothers, who, so far as the record shows, had always been on good terms. The older always intended to take care of the younger in some measure and did so in his will. Then the younger takes the older driving several times, and the older decides to increase the amount he is to get because, as he says, he is his only brother and he does things for him.

There is nothing in this situation from which any inference of impropriety may be drawn and a jury cannot be allowed to speculate on possible influences, reasons or conversations of which there is no tangible proof. The fact that John Warehime cried at times, or was disturbed after the visits of his brother may have been due to many causes. It cannot be used as a basis for an inference that he was sorry for what he did, or that he had done something he did not want to do. See *Drury v. King,* 182 Md. 64, 32 A. 2d 371.

We think there was not enough evidence to permit the jury to pass upon the issues in this case, and that the trial court was correct in its rulings in this respect. The judgment of the lower court will therefore be affirmed.

*Judgment affirmed, with costs.*