## GORDON *v.* RAWLES

[No. 83, October Term, 1952.]

504

*Decided February 11, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*William I. Gosnell,* with whom were *Nicholas, Gosnell & Hayes* on the brief, for the appellant.

*James C. Burch* for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a decree annulling a deed from Isaac T. Rawles, appellee here, and his wife, Sarah Rawles, holding as tenants by the entireties, to James Gordon, appellant here.

The testimony for the purposes of this case shows the following. On April 2, 1945, the appellee and his wife purchased a house at 1562 Clifton Avenue, Baltimore, for the price of $3,000.00, subject to an annual ground rent of $48.00, paying $260.00 in cash and giving a mortgage for the balance of $2,470.00. The husband worked at "Holabird" and the mortgage was paid off early in 1951. About July 4th of that year Sarah Rawles became ill and worked only one day in September before her death on November 20, 1951. Prior to July she had been working as a domestic. Before 1951, Isaac became disabled and has not worked since, and has been drawing from social security about $28.75 per month. About August 14, 1951, the Rawles installed a hot water heater in their property and borrowed $225.00 to pay for this. They were required to pay $18.00 per month on this debt.

Isaac Rawles, 72 years of age, who could read and write, testified as follows: He and his wife met the appellee, James Gordon, in 1925, and became friendly with him. On September 27, 1951, while his wife was sick in bed, he and his wife signed a fee simple deed of their home to James Gordon. He had not consulted a lawyer previously. When asked on direct examination why he signed the deed to James Gordon, he said: "I was in the cellar at the time, and so they called me up the stairs and I came up, and Jimmie [Gordon] said— * * * Yes, he said he was going to take it over and help me out. I did not know—she had not consulted with

me, had not told me nothing in the world about it. I did not know nothing about it and did not know he was there until they called me up out of the cellar, and when I goes up out of the cellar they sprung this to me, and said Jimmie would take it over—he would help me out. It was news to me. No one had not told me, and I said: 'Well, all right.' And then he asked me to sign, and I signed the piece of paper, you know. I had not heard nothing about it, and I know he had been a friend, you know, and I thought the heater that was in there, that is in there now, and after he said that I said: 'Well, if you want to help me out'—I thought, you know, he was standing for it, or something like that, and that is why I put my signature on it. She did not consult with me and did not tell me anything.' He further said no one else explained the deed to him. He thought at that time they owed fifty or one hundred dollars on the water heater. He said: "I don't know because they did not tell me anything." He did not know whether the taxes had been paid. He further said he wanted his property back and was willing to pay Mr. Gordon any money which he had paid on the property. He testified that he did not know what he was signing. He recognized Mr. William I Gosnell who prepared the deed and agreement, as being in his house the day the deed was signed. He said he did not recall that Mr. Gosnell told him he was deeding the property, getting rid of it completely by giving it to Jimmie. He said he remembered Mr. Gosnell saying to him and his wife that he did not think it was a good idea and that it would be better for him and his wife to keep the house for life, and then the remainder after his death to go to Jimmie, and that in the meantime Jimmie should pay the taxes and ground rent and things of that kind. He also remembered his wife insisting and saying in the presence of Mr. Gosnell: "No, I don't want it that way, I want Jimmie to have it now." He further said his wife carried on all the business of the house. He said he had implicit confidence in her and whatever she

did or advised him to do, he generally would do. Dr. J. Douglass Sheppard, whose qualifications were admitted and who examined Isaac Rawles in September, 1950, testified that in his opinion "he was a little slow in comprehending" and that his condition would probably progress.

Louise Copeland, a daughter of Isaac Rawles by a previous marriage, testified that in August, 1951, Sarah Rawles asked her to loan her money to pay her taxes. She said she did not have the money then but would have it in two weeks. At the end of that time she went to tell Sarah she was ready to pay the taxes and found that the water heater had been put in. She found out later that Mr. and Mrs. Rawles had deeded the property to the appellee, having been told by her sister. Sarah did not say anything to her about it. She said after Sarah's death she asked Gordon about the taxes and he said: "I have time to pay them." The granddaughter, Mildred Blackwell, was living with Isaac in the house and continued to pay $8.00 a week so Isaac would be fed. She was looking after him. Louise Copeland said the reason she called Dr. Sheppard in September, 1950, was because: "Mother was making a complaint about him—well, he was saying things and he was nervous and one night he went downstairs and went into the basement, and got an iron pipe, he thought he heard some one in the living room, and when he came back he drew the pipe back to strike and there was no one in there, and he said he was so nervous. He sat down and was shaking like a leaf, and for two weeks mother said she did not pull her clothes off, she was so afraid of him. She would tell us often how he carried on." She said that Sarah ran everything in the house and Mr. Rawles did about what she said.

James Gordon, the appellee, testified, that he had not paid the 1951 and 1952 taxes on the house because Louise Copeland would not give him the tax bills. During the argument of the case in this Court we were advised that he has now paid the taxes. He said he had paid

$17.60 on the water heater and that is all he had paid. He earned about $76.00 a week driving a crane, had no dependents, and lived in one room. When asked why the house was deeded to him, he replied as follows: In 1951 Mrs. Rawles said: " 'Jimmie, I am going to give you this home.' She said: 'You have been nice to me. You have lent me money. Some I paid back and some I did not.' And she said: 'I feel like you have did enough for me to give you this home to keep it from getting away. I offered it to my children and they said they did not want it, and I am going to give it to you.' I did not believe her. I did not pay it no mind. So she sent for me and kept sending for me, and I made up my mind to go to see what she wanted. So I went up there, and she said: 'Jimmie, I want to give you the home.' I said: 'You want to give me your home?' She said: 'Yes, you were nice to me.' And I said: 'Well, if that is the way you want it I guess I will make up my mind.' I still did not make up my mind, and she kept sending for me, and I went back again and the last time I went back I called Mr. Rawles and Mrs. Rawles together, and we were talking. I said: 'Mr. Rawles, do you know what your wife wants to do?' He said: 'What is it, Jimmie?' I said: 'She wants to give me this home. It is both of your home together. What do you say about it?' He said: 'If Sarah wants you to have it I want you to have it.' I still did not decide whether to take the home or not. So she keeps sending back, and so I went back again, and she said: 'I am going to give you the home.' I said: 'Get your lawyer that bought the home for you to fix it up.' She calls a lawyer. The lawyer was out of town, and she told me to get a lawyer, and I did not know anything about no lawyer. A friend of mine working on the job, I asked him where I can get a good lawyer, and he said: 'Yes, Jimmie, Mr. Gosnell.' I said: 'Where does he live at?' He said: 'Right around the corner from you.' So I went up and saw her that night and talked with her again, and I came down to Mr. Gosnell's house. So

he could not understand it himself. I said: 'Call her,' and he called her, and he said: 'You are right.' So he went up to see about it, so that was all of that." He said Mrs. Rawles had called him about six or seven times. The papers were signed in the presence of himself, Mr. and Mrs. Rawles, and Mr. and Mrs. Gosnell, and that Mr. Gosnell told Mr. and Mrs. Rawles: " 'Do you all know what you are all doing?' He said: 'Do you know you are signing off your rights?' And he told them, he said: 'Take my advice, why not give him the place after you all are dead?' That is the way. I could not explain just like he did, and they said: 'No, we don't want it like that.' Both of them said: 'We will give it direct.' " He said he thought they understood what they were doing. He testified that he had known the Rawles for many years. They had great affection for him and great confidence in him. Mrs. Rawles frequently borrowed money from him and she owed him perhaps $100.00 at that time. He was not sure of this. There were no liens against the property. It was subject to the annual ground rent of $48.00. At the time the deed was executed an agreement was also signed by which James Gordon agreed as long as the Rawles lived they were permitted to occupy the house in full. Gordon further agreed that he would pay "any and all obligations against the property * * * such as Ground Rent, Taxes and water rent bills now accumulated for repairs and improvements to the property, and said party of the second part [Gordon] agrees further that he will at no time during the life of the parties of the first part [the Rawles] encumber the property now conveyed beyond the extent of One Thousand ($1,000.00) Dollars without the written consent of the said parties of the first part." Mrs. Rawles died about two months after the deed and agrement were signed. He said the house was not taken in payment of any money owed him.

Betty Rawles, another daughter of Isaac Rawles by a former marriage, testified that Mrs. Rawles asked her three times to tell James Gordon to come to the

house because she wanted to see him. Mrs. Rawles had offered to turn the house over to her but she would not take it because she had a place of her own. She told Betty "I will turn it over to Jimmie, and I am sure he will take care of it." Betty replied "I will see that he does." Betty never talked to her father about the matter. Mrs. Rawles was younger than her husband and took care of everything herself. Betty said it was through her that Mr. and Mrs. Rawles met James Gordon.

Mr. William I. Gosnell, the attorney who drew the deed and agreement, testified that James Gordon was sent to him by one of his clients and Gordon told him that Mrs. Rawles wanted to give him the property. He further testified: "I would say it is worth between $4,000.00 and $4,500.00. Frankly, I just could not understand it, and I went up to see these people, and I told her that was not the way it is usually done, she should have a life estate, you know, and after their death to him, and they insisted they did not want that, so I said: 'That is the way it should be done anyhow,' and I then drew a deed. None of them knew about that separate agreement. I prepared that out of my own thought because I did not know the man, and I felt he might at some time try to do these people out." He repeated that the Rawles "wanted a straight deed". The agreement was not acknowledged or recorded. He further said as to Gordon: "He has a nice car and he makes a good salary. They would not let me draw the kind of deed I wanted, so I just prepared that deed. Mrs. Rawles was very much more active than Mr. Rawles. She ran everything. I had not seen the people before or since until I came down here and the time I went back and took my wife, who is a notary, up there, and she called him up. He was in the cellar, and I explained it all to him. I told him: 'I think you are being very foolish, but if that is what you want to do that is your business. You are conveying your entire estate away.' And they said: 'He has been the best friend we have had. Whenever we wanted anything we could

get it.' They came after the man three or four times, and I explained the agreement to them, and every one was happy. * * * I told both of them they would have no more interest in that property, and if he wanted he could convey it away to some one else, and they said they did not have any thought he was going to do anything like that." On cross-examination he stated that he had no conversation with Mr. Rawles prior to the day the deed was executed but had discussed the whole matter with Mrs. Rawles out of the presence of her husband. He quoted Mrs. Rawles as saying: "If he will just keep up the expenses. I am afraid we will lose the property, and we don't have anybody else to take it, and we know if we give it to him he will pay the expenses." When asked the question whether he believed Mr. Rawles understood what they were talking about, Mr. Gosnell replied: "You asked me whether I believe—I thought Mr. Rawles was a man whose wife had been running things so long he would have agreed to most anything she said because she transacted apparently everything. * * * I asked him did he understand, and I read it and I went over the agreement with him, and told him I thought they were very foolish for doing it." He said he thought Mr. Rawles understood it. James Gordon paid Mr. Gosnell for his work. Mrs. William Gosnell testified that she took the acknowledgement of the deed and heard her husband thoroughly explain the matter to Mr. and Mrs. Rawles.

The chancellor by decree declared the deed and agreement here in question null and void and of no effect. He further ordered the appellee, Isaac T. Rawles, to pay unto the appellants, James Gordon, the sum of $272.74 "on account of taxes and judgment notes on the property, 1562 Clifton Avenue, said sum to be a lien upon the property, 1562 Clifton Avenue, Baltimore City, Maryland, until paid. And upon payment of the said sum, the Defendant is to execute a release to the Complainant acknowledging receipt of the aforesaid sum." He also

ordered the defendant to pay the costs. From that decree appellant appeals.

In the opinion in this case the chancellor said the following, among other things: "I cannot agree with the plaintiff's contention that the defendant stood in a confidential relation to the plaintiff. * * * I unhesitatingly accept as true the plaintiff's testimony that he did not know what he was signing. He did not have the benefit of conferring with any one who was in a position to advise him impartially as to the consequences to himself of this transaction. * * * No one can tell whether there was or is any gross inadequacy of consideration. That would depend upon how long both Mr. and Mrs. Rawles would live, but, because of their age, it would appear that there would be inadequacy in the consideration. * * * The plaintiff did evidence stupidity to a great degree in the course of his testimony. * * * In this case, Gordon by overreaching obtained from the plaintiff, who was weak, unwary, helpless and ignorant, an unconscionable and inequitable advantage."

We agree that there was no confidential relationship between the plaintiff and the defendant in this case. We cannot agree, however, with the learned chancellor that Gordon overreached in this case or was guilty of any fraud. From all the testimony in this case he was very reluctant to accept the deed and only did so after repeated requests by Mrs. Rawles. As found by the chancellor, it appears that at the time of the hearing the appellee was stupid. He also appears to be very forgetful. However, this Court has adopted the rule that the law presumes that every man is sane and possesses the requisite mental capacity to execute the instrument attacked and the burden of proof rests, as a consequence, upon those who allege the contrary. *Brown v. Ward,* 53 Md. 376, 387. Testimony in order to be legally sufficient to overthrow the presumption in favor of a person's sanity and capacity, must be directed to the date of the execution of the paper attacked, and must tend to show that he was incompetent at that par-

ticular time. Mere eccentricities, such as that found in people of ordinary sound mind, do not show lack of mental capacity. *Lynn v. Magness,* 191 Md. 674, 681, 62 A. 2d 604. The only medical testimony on mental capacity in this case was that of a doctor who examined the appellee a year before the deed here in question was signed and who said the appellee "was a little slow in comprehending" and that his condition would probably progress. Louise Copeland, who testified to the eccentricities of the appellee, appears by no means to be an impartial witness in this case. Certainly every effort was made to explain to the appellee the effect of the paper he signed and unless he was incompetent at that time, which we have not found in this case, he must at the time he signed the deed have understood its legal import. It might possibly be that at the time of the hearing, being forgetful, he did not remember all the details of the signing. This is not sufficient to set the deed aside.

In *Brandenburg v. Harshman,* 193 Md. 104, 65 A. 2d 906, Mrs. Harshman, who in 1931 or 1932 had suffered a paralytic stroke, conveyed to her daughter, Mrs. Zimmerman, in 1939, in consideration of love and affection, the home place in Walkersville. When 75 years of age, she moved to Baltimore to live with Mrs. Zimmerman, and the latter's family. Mrs. Zimmerman later sold the property to Mr. Staley, who gave a purchase money mortgage for the full purchase price of $10,000. It was agreed that this was a fair price for the property. Later, on April 27, 1942, Mrs. Harshman transferred to Mrs. Zimmerman 120 shares of stock of the Walkersville Water Company. Mrs. Zimmerman died on September 27, 1945. In the administration of her estate the purchase money mortgage of $10,000 and the 120 shares of stock were distributed to Mrs. Brandenburg, the daughter and only child of Mrs. Zimmerman, the granddaughter of Mrs. Harshman. Mrs. Brandenburg, who had been previously employed, gave up her employment and took care of her grandmother until 1947, when

she had a child. Then because of her own poor state of health and the care of her child it was impossible for her to care for her grandmother and it was necessary to move Mrs. Harshman to the home of her son, Harold Harshman. On September 10, 1947, Mrs. Harshman filed a bill of complaint asking that the deed of the property to Mrs. Zimmerman in 1939, the deed to Mr. Staley in 1945, the purchase money mortgage given by the Staleys, and the transfer of the stock all be set aside and declared null and void. It was also asked in the alternative that if these could not be set aside, that the Court should consider the home place and the securities as impressed with a trust in favor of the complainant. The $10,000 mortgage had been paid off just prior to the institution of the suit and the money had been paid into court where it had been agreed that it should substitute for the home property. There was no evidence that Mrs. Harshman was mentally incompetent. She had had little education and no business transactions. The chancellor held that there had been a confidential relationship between Mrs. Harshman and Mrs. Zimmerman and Mrs. Zimmerman had not met the burden of proof imposed upon her. He decreed that the $10,000 was the property of Mrs. Harshman and that the 120 shares of Walkersville Water Company stock was also her property. On appeal to this Court we agreed that a confidential relationship existed between the mother and daughter but that the mother transferred the property to her daughter and the daughter took care of the mother just as if some definite written agreement had been made to that effect and that we could not say that it was an unfair or unreasonable arrangement. We also found that after the death of the daughter the granddaughter carried out the actual or implied arrangement to take care of the grandmother until it became impossible for her to do so. Chief Judge Marbury said in that case: "When it became impossible, then a new situation arose. We do not think it would be just or equitable to strike down the transfers of the

real estate and the stock and turn the proceeds back to the mother. According to the testimony, she is not capable of taking care of herself, but irrespective of that, it would not be fair to the granddaughter, the legatee of the daughter, to disregard entirely the care already given to the appellee, and to require her to return the property which was turned over to the daughter presumably in exchange for that care. *Long v. Huseman,* 186 Md. 495, 47 A. 2d 75. On the other hand, since the granddaughter can no longer give the appellee that care, it would not be just to the latter to let the transactions stand, and leave her without further benefit from the implied or active agreement made. We think the properties are impressed with a trust to the end that the agreement of the parties may be carried out, so far as possible. We will direct the appointment, by the Court, of a trustee, to receive, hold and invest the proceeds of the mortgage now in the custody of the Clerk, less court costs, and also the Water Company stock, and to use the income therefrom, and the principal, if necessary, under the direction of the Court, for the care of the appellee during the remaining years of her life. After her death the trust estate, or what remains of it, will become the absolute property of the appellant, Mrs. Brandenburg. This solution is approved, (and indeed suggested) by the appellants. The result will be of benefit to the appelee, athough not all she asked for." See also *Belote v. Brown,* 193 Md. 114, 65 A. 2d 910, where this Court refused to strike down a deed and agreement for care but sustained the decree in which there was incorporated certain accounting as provided for in the agreement.

In *Kincaid v. Miles,* 193 Md. 620, 69 A. 2d 268, the following was said: "The chancellor expressed the opinion that it was doubtful if the association of the defendants, without evidence that Miss Miles received or relied upon any business advice from them, was sufficient to establish a confidential relation, particularly in view of the independent advice she received from her

attorney. Cf. *Benedict v. Wareheim*, 187 Md. 150, 157, 49 A. 2d 444, and *Myers v. Myers*, 185 Md. 210, 44 A. 2d 455. Nevertheless, in the decree appealed from he found from the circumstances and gave effect to an implied trust, in the case of the Windsor Road property, 'to support nurse and provide medical attention for their benefactor until the time of her death', and assumed jurisdiction of the express trust voluntarily created in connection with the farm property. Support for this action may be found in the recent case of *Hoffman v. Rickel*, 191 Md. 591, 62 A. 2d 597, *Brandenburg v. Harshman*, 193 Md. 104, 65 A. 2d 906, and *Belote v. Brown*, 193 Md. 114, 128-129, 65 A. 2d 910, 917. The arrangement consummated by the decree cannot be deemed unfair to the incompetent, or improvident. On the contrary, it affords the maximum protection consistent with her manifest desire to provide herself with care and comfort during her life and the devolution of the property remaining at her death to the persons of her choice."

In the instant case, although the incorporation of the agreement in the decree is not suggested by th appellant, his attorney justly and rightly drew the agreement and had it signed for the purpose of protecting the rights of the Rawles. Not having been acknowledged and recorded there is nothing to prevent the appellant from disposing of the property. "We think the properties are impressed with a trust to the end that the agreement of the parties may be carried out, so far as possible." *Brandenburg v. Harshman, supra.* We therefore direct the appointment, by the chancellor, of a trustee to hold the property at 1562 Clifton Avenue, Baltimore, under a trust, that Isaac T. Rawles during his life, is to occupy the house in full. James Gordon is to pay any and all obligations against the property such as ground rent, taxes, water rent and ordinary repairs. Upon the death of Isaac T. Rawles the property will become the absolute property of the appellee, James Gordon. Upon failure of James Gordon, during the

lifetime of Isaac T. Rawles, to pay the obligations above set forth, the trustee is to deed the property to Isaac T. Rawles in fee simple and all interest of the said James Gordon in said property is to thereupon cease and become forever null and void. The trustee is to in no way encumber the property without authority from the equity court having jurisdiction. The case will be remanded for the passage of a decree in accordance with this opinion. ' Costs are to be paid by the appellant, James Gordon.

*Case remanded for the passage of a decree to conform with this opinion, costs to be paid by the appellant.*