HOFFMAN ET AL. *v.* RICKELL

[No. 29, October Term, 1948.]

592

*Decided December 8, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, HENDERSON, and MARKELL, JJ.

*Donald C. Sponseller* and *Stanford Hoff* for the appellants.

*Theodore F. Brown,* with whom was *Ralph G. Hoffman* on the brief, for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

In the year 1945 the appellee, then a man of 74 years of age, was living with his wife in his house near Westminster, Carroll County, Maryland. Helen M. Hoffman, his only daughter, and her husband, J. Thomas Hoffman, the appellants, were living in the City of Baltimore in property on North Calvert Street, which they owned. On May 9, 1945, the appellee and the appellants entered into an agreement setting out that the appellee, having arrived at an advanced age and being physically incapacitated, decided to live with the appellants in their home where he could be comfortable, and to that end he had conveyed to them certain real estate in Carroll County to compensate them for furnishing him a home. The appellants agreed in consideration of such conveyance that they would furnish the appellee a comfortable home and upon his death they would pay the expenses of his funeral and burial. This paper was drawn by a lawyer, and, on the same date it was executed, the appellee and his wife conveyed to the appellants the property in which they were living by one deed, and, by another deed, conveyed to them another piece of property, also in Carroll County. This last conveyance reserved to the appellee during his natural life all the rents, incomes and profit therefrom. Three days after these papers were executed, the appellants reconveyed to the appellee the two properties. Different reasons are given by the parties for this reconveyance. The appellees stated that the appellants were dissatisfied. Mrs. Hoffman said there was a misunderstanding about how the agreement was written and she thought it would be better to turn the property back.

Mr. and Mrs. Rickell had been undergoing treatment at a hospital in Baltimore in May, 1945, and after these transactions they came to the appellants' home and Mr. Rickell remained there until the first part of July and Mrs. Rickell until the middle of August. During this period there was apparently considerable discussion centered around the idea that the appellants would come to Westminster to live with the appellee and his wife. Mr.

Hoffman was employed in Baltimore and it would be quite inconvenient for him to travel back and forth from Westminster to his place of employment, especially as he had no car, and would have to travel by public conveyances. Mrs. Hoffman at the time was renting rooms in her house from which she received an income of $40. a week. It was, however, finally agreed that the appellants should come to Westminster to live in the house of the appellee, and that the appellee would convey this house to them. Mr. Rickell and Mrs. Hoffman went to the office of the same lawyer in Westminster who had handled the previous transaction in May, and deeds dated September 4, 1945 were made by the appellee and his wife to a straw man and back from the straw man to the appellee and the appellants as joint tenants. The lawyer who handled the transaction testified that no contract was prepared in September, and he had no independent recollection of any agreement that was discussed or made between the parties. He asked Mr. Rickell if he was sure of what he was doing, this inquiry being brought about by the fact that the previous transaction in May had been so promptly revoked. Rickell paid for the preparation and the recording of the deeds.

As soon as the deeds of September 4th were put on record, the Hoffmans made arrangements to dispose of their property in Baltimore, which they subsequently did, and to move to the Carroll County home, bringing with them most of their furniture. The two families then started to live together in the same house. Mr. Rickell contends that the Hoffmans had agreed to provide him board and care during the term of his natural life for the sum of seven dollars a week, and that this was the reason he conveyed the property to them. The appellants contend that they agreed to go to Westminster and live with the appellee and his wife because the latter were unable to look after the property in Westminster due to their age and physical condition, and that it was understood that all expenses and maintenance of the property were to be shared equally by them and Mr. Rickell.

About a month after the appellants had moved into the house Mrs. Rickell went to the hospital where she remained for two months, and then came home and died in February, 1946. At the time appellants moved, Mrs. Rickell was sick and she went away for a short period of time and, according to Mrs. Hoffman's testimony, she asked the latter to feed Mr. Rickell for seven dollars a week during her absence. This continued for some time and then was discontinued from time to time because of disagreements between Mrs. Hoffman and her father. She stated that it was because he refused to eat her food and that every two months or so he would eat elsewhere, and then eventually come back. He contends on the other hand that she declined to give him any food at times, although he admits that at other times he got food. He also admits that he paid some of the expenses of the house, including a bill for fuel oil. The Hoffmans had improved the property, put in an oil burner, and made other changes.

The bill of complaint in this case was filed by the appellee to strike down the conveyances from him and his wife to the straw man and from the latter to him and to the Hoffmans as joint tenants, on the theory that the conveyances were made on the appellant's promise to board him, and that they had refused to carry out that promise. Considerable testimony was taken and the Chancellor concluded that there was a confidential relationship between them, the burden was on the daughter to show that the transaction was righteous, the daughter had failed to meet such burden of proof, and therefore the deeds were declared null and void but the property was to be held by the appellee subject to a lien for such amounts of improvements and betterments as the appellants might be able to show had been made on the property. From this decree the appellants appeal.

The testimony shows that there were undoubted disagreements between the father and daughter which resulted in the father's eating somewhere else than at the daughter's table. From the testimony of the appellants

and from other witnesses who observed certain incidents around the house, it is perfectly apparent that Mr. Rickell was a very coarse, uncouth and unfeeling man, with whom it was difficult for anyone to get along. This was known to the appellants before they went to live with him and Mr. Hoffman testified that he told Mr. Rickell that he did not want to come because of the constant fussings and fightings that would be going on, and that Mr. Rickell said there would be no trouble of that kind. It appears, however, that Mr. Rickell's temper would frequently get the better of him, and he would call his daughter vile names and threaten her. Just before his wife died he told his daughter in the presence of a visitor that the daughter had to get out as soon as her mother died. Mrs. Hoffman testified that her father told her mother when she was on her deathbed that she had a cancer and was going to die and as soon as she was cold he was going to bring another woman in the house. Mr. Rickell denied this, and there is no corroboration of this very unfeeling statement, but the fact does remain that shortly after this suit was instituted, Mr. Rickell married a second time and brought his new wife home. Mrs. Hoffman also testified that when she agreed with her mother to board Mr. Rickell for seven dollars a week, her mother told her that her father had given her, the mother, eight dollars a week to board him. Mr. Rickell said that the mother was to get her board which she was to pay for herself. The mother apparently had some property of her own, because the granddaughter testified that she was present when her will was read, and Mr. Rickell was enraged at the terms of the will, and made threats and blasphemed, and said it made no difference, he would get it back, including the house.

Mrs. Hoffman testified that her father was to deed the property to her and her husband, and that when she found out his name was also on the deed, she went to see her lawyer about it, but finally decided to let it go and not do anything about it. Mr. Rickell said that it was when she found out about this that she refused to feed him, but

he admitted that he had eaten a number of times at her table after that time.

The mere fact that a parent and child make an agreement is no cause for voiding it on the later request of one or the other. In each case there is a question of fact whether the relationship is such as to give one party dominance over the other, or to put him in a position where words of persuasion have undue weight. *Restatement of the Law, Contracts,* paragraph 497 and Comment A. *Owings v. Currier,* 186 Md. 590, 47 A. 2d 743, *Bass v. Smith,* 189 Md. 461, 56 A. 2d 800. In a parent and child case, the parent is usually the dominant party, but the rule is reversed where the parent relies heavily upon the child for care and protection or for guidance in business affairs, when the child becomes the dominant party. *Grimes v. Grimes,* 184 Md. 59, at page 63, 40 A. 2d 58 and cases cited. In *Mead v. Gilbert,* 170 Md. 592, 185 A. 668, 674, it is stated that "where a conveyance from a parent to a child is attacked, the existence of a confidential relationship between the parties is a fact to be shown, as in any other case where it is not presumed as a matter of law (*Upman v. Thomey, supra* [145 Md. 347, 125 A. 860]), and that in such an inquiry advanced age, physical debility, and mental feebleness are all facts, no one of which is necessarily conclusive, but any one of which may have weight in determining whether the relationship as a fact existed." The Court quoted from *Beinbrink v. Fox,* 121 Md. 102, 104, 88 A. 106, the statement that it is firmly established that where an aged parent makes a conveyance to a child the burden is cast upon the grantee of establishing the fairness of the transaction. In discussing this quotation the Court said that it is not to be understood as meaning the mere age without reference to any other fact is sufficient in itself to justify an inference that the confidential relation exists, and that age in itself is but a fact to be considered in connection with other facts affecting the question. In this connection it may be noted that in the *Beinbrink v. Fox case, supra,* in which the statement was made, the mother

was 76 years of age when she conveyed a farm to her daughter, but the court found that the deed was a voluntary, conscious and deliberate act of the mother for valid consideration, and declined to upset it. In the recent case of *Myers v. Myers,* 185 Md. 210, 44 A. 2d 455, 460, where a 74 year old mother gave property to her son, we held that under the circumstances in that case the son did occupy a confidential relationship to her, but that there was no sufficient evidence to justify striking down the conveyance. We stated our conclusion in the following words: "We hold that when a person voluntarily conveys property by deed valid and absolute on its face and duly recorded, without fraud, undue influence, or imposition exerted upon him, the court has no authority to nullify the deed merely because he later changed his mind and regretted the conveyance." See also *Williams v. Robinson,* 183 Md. 117, 36 A. 2d 547 where the grantor was 68 years old, but the court found the conveyances voluntary and refused to annul them.

In the case before us there is no evidence whatever that the appellee was infirm mentally, or that any undue influence was exercised over him. While there is testimony that he had had two operations and he was unable to work, it is not indicated what the operations were or how serious they were, and he does not seem to be otherwise physically infirm, nor do we find any special mental strain he was under, due to the health of his wife. Such evidence as there is would lead us to the conclusion, if we were obliged to reach any on this point, that Mr. Rickell did not feel as much concern for his wife as the ordinary man would under such circumstances. The daughter testified that she has a severe heart condition, and her health is not good in other respects. Mr. Rickell was certainly not dominated by his daughter, or anyone else. He appears to be a man of vigorous and determined personality who wants to have his own way at all times, without giving much consideration to the wishes of others. Whether it was his persuasion and that of his wife which induced the appellants to come to Westminster, or wheth-

er they were glad to do it, for the sake of getting title to the property, is not important, because there obviously was an agreement which provided for the care of the home in which the appellee and his wife desired to remain, and in order to undertake this, the daughter and her husband gave up a more convenient and perhaps more lucrative mode of life, sold their city property and moved into a situation which certainly does not appear to have been an agreeable one. The appellee did not strip himself of his property, and apparently still has some means. He is still living in the home and has, as we have stated, paid part of the upkeep. As he has an interest in it he has, of course, a right to remain there. The fact that this right might be complicated by his addition of another wife is not a matter for our consideration. There is a difference of testimony as to what was the agreement. But even if it was to board the appellee at seven dollars a week, which he claims and which the daughter denies, the failure to carry out this agreement would not justify the striking down of the deeds under the circumstances. The daughter does seem willing to continue to feed her father as long as he behaves himself, although she denies that she made any such agreement. We can find no equity in striking down the deeds, putting the daughter and her husband out of the property and requiring them to find a home elsewhere under the circumstances in this case. In that respect it is somewhat like the case of *Long v. Huseman,* 186 Md. 495, 47, A. 2d 75, although in that case we found the mother who had put some money in a piece of property her daughter and her husband were buying, was forced to leave the home promised her because of their conduct. We did not, however, in that case, require that the mother be repaid the money she had voluntarily put in the property, but provided for the payment to her of interest as long as she lived elsewhere. In the case before us we are unable to agree with the learned Chancellor that the circumstances justify the existence of any confidential relationship between the appellee and his daughter. We think he made a voluntary

bargain, and the evidence does not clearly indicate that the appellants have not carried out their part of the agreement. Since that is our conclusion, we are unable to justify the striking down of the deeds, and the decree will be reversed and the bill dismissed with costs.

*Decree reversed and bill dismissed with costs.*

MARKELL, J., filed the following concurring opinion:

I agree with Judge Boylan, who saw and heard the witnesses, that this is a case of confidential relations and defendants have the burden of proof of the fairness of the transactions with plaintiff. The opportunity to see and hear the witnesses is important not only because much of the opposing testimony is flatly contradictory, but also because father and daughter are both unusual personalities and can be better understood (if at all) after seeing and hearing them. In May they entered into a written agreement reciting that plaintiff, "having * * * arrived at an advanced age and being physically incapacitated, desires to live with [defendants] in their home, where he can be comfortable the remainder of his life" and to that end has made conveyances to them to compensate them for furnishing a home and for their covenants, and they covenant and agree "that he may live in their home during the remainder of his life, and during all that time they will furnish him a comfortable home [with or without food?] with them" or the survivor. Three days later the properties were reconveyed and the agreement thereby terminated. The daughter paid the lawyer for the preparation and recording of the deeds. He thinks plaintiff paid him for recording the September deed. The September deed was accompanied by no written instrument showing any actual consideration whatever for it. Plaintiff had no independent advice about it; the lawyer acted as a mere scrivener, not as an adviser. Between May and September plaintiff and his wife had both been in the hospital, he had been

operated on twice and she was evidently dying of cancer. Though the record shows little or no feeling on his part toward her, he was from his own selfish point of view left helpless by her illness and approaching death. He had only his daughter to turn to.

The fact that an old man is "coarse, uncouth and unfeeling" and "difficult to get along with" and "wants to have his own way at all times" and calls his daughter vile names, may be good reason for her to refuse to live with him, but she has the right to refuse without any reason, good or bad. Such conduct does not show him "to be a man of vigorous and determined personality"; it only shows infirmity of temper, and perhaps of character, not uncommon in either first or second childhood. It does not justify a daughter in taking advantage of him. King Lear was a querulous old man but has not, on that account, been regarded as fair game for his daughters. I therefore agree with Judge Boylan that a deed without actual consideration from plaintiff to defendants could not stand. It is hardly necessary to add that plaintiff's second marriage at 76 does not necessarily evidence any strength or independence of personality.

This court, however, finds that there was some oral agreement between the parties, which provides for a home for appellant and is enforceable, though the exact terms of the agreement are not found. On this basis I think the agreement would be a fair one and a fair consideration for the September deed. I agree that if this agreement should be broken, breach would warrant enforcement of the agreement but not striking it down, including the deed. On this ground alone I concur in the result.