RICHARDSON ET UX. *v.* WICKART

[No. 120, October Term, 1949.]

36

*Decided April 13, 1950.*

The cause was argued before MARBURY, C. J., and COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Emanuel Klawans,* with whom was *Albert J. Goodman,* on the brief, for appellants.

*Arthur A. Anderson, Jr.,* with whom were *Henry C. Garde* and *John G. Rouse, Jr.,* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by Edward J. Richardson and Louise Richardson, his wife, from a decree declaring a transfer of $4,300 and a lot of land to Edward J. Richardson by Henry Wickart, appellee here, null and void.

Henry Wickart, the appellee, for the past forty years has owned a three-acre tract of land on Bodkin Creek in Anne Arundel County and has for a long period of time operated there a marine railway and boat yard. He has improved the property by four small houses in one of which he lives and the others of which he rents. At the time of the filing of the bill of complaint in this case on June 4, 1948, he was eighty-six years of age.

In 1937, Norman Easter, the son of Wickart's divorced wife, began to assist him in the boat yard after his regular day's work. He worked on week-ends and during the evenings. On November 3, 1937, Wickart opened an account in the amount of $2,836.17 in the Savings Bank of Baltimore in his name and in the name of Norman Easter, subject to the order of either and at death to go to the survivor. About the same time he made a will leaving his entire estate to Norman Easter. He also made an agreement with Easter, who was then working for him, whereby any money received by Easter for boat repairs belonged to Easter, and one half the amount received for storing, pumping out, towing and hauling boats on the railway was to be divided equally between Wickart and Easter. Wickart was to receive the total amount of the receipts from house rent and the sale of oil and gasoline. In July and August 1946, Wickart and Easter had arguments over the collection of money. Wickart also had a disagreement with Easter's mother-in-law and as a result Easter gave up the house which he had rented from Wickart and quit the premises. On August 20, 1946, the joint account then in the amount of $7,079.60 was closed out by Wickart.

In March 1944 a boat owned by Edward J. Richardson, one of the appellants here, sank near Wickart's boat yard and was pulled up on his railway. At that time Richardson was operating a radio business in Halethorpe. The boat was in very bad condition and Richardson came down on week-ends to repair it. He and his wife and family occupied a rented shed on Wickart's property and finally, about a year later, they rented and moved into half of Wickart's house. In May 1946 the radio business not being prosperous on account of the inability to get parts, Richardson sold it and moved to Wickart's place permanently. He had no employment, but with a small amount of cash on hand he worked on his boat and fished. Norman Easter was there at that time and remained until July or August 1946. From that time

on the testimony as to the negotiations between Wickart and Richardson is in conflict.

Wickart testified that before Richardson was employed by him and after Easter had left he, Wickart, became sick and at that time Richardson said to him: " 'Captain, you are sick and you can't attend to business, if you want me to I will take care of them at 50-50,' and I said 'If you want to take it over it's your own business, but I cannot take care of it. * * * If he pulled a boat out he was to get half, and if he collected rent he was to get half, and half of any other money paid I was to get half of it unless it was his own business, if he did any work on a boat that was not mine, anything that required anything of mine in the use of it he was to give me 50 and he take 50. * * * After a heavy rain, pump the boats out and take care of them, and see to it they were properly fastened to the stake, and keep them afloat."

Wickart testified that while he was sick, but before he was "real sick" Richardson said, "beings you took us, if the will you have, you have not got anybody, and I am going to take care of you and the place, would not be a bad idea if you will the property to me. And I said; 'you look all right,' and I will it to him." The will was drawn by a lawyer suggested by Wickart leaving everything to Richardson. He admitted that at that time Richardson and his wife were treating him very well. He said at the time he was sick and before he went to bed, Richardson suggested to him that as he had no relatives he turn his bank account over to him. On August 20, 1946, Richardson drove Wickart to Baltimore and Wickart closed the account in the amount of $7,079.60 in his name and in the name of Norman Easter and opened a new account in the Savings Bank of Baltimore in the same amount in the name of Henry J. Wickart, subject to his order or Edward J. Richardson, without survivorship. On the next day, August 21, 1946, that account was closed by Wickart and a joint account in the amount of $7,079.60 was opened in the joint names of Henry J. Wickart and Edward J. Richardson, sub-

ject to the order of either, with right of survivorship. Wickart testified that at that time he was the boss.

He said while he was sick the Richardsons took good care of him and he owed his life to Richardson. In October 1947, Wickart testified that Richardson came to him and said: " 'Now, if you are short of money give me the bank book and I will go up and draw what you want,' and I said, 'That bank book was not to be turned over to you, that was to be yours after my death,' so I thought if that was the case you and me get that book and go up there and draw it all, and I got scared, that is how I came to go up there and have the names changed." Wickart thereupon on October 15, 1947, closed out the joint account then in the amount of $8,603.93, which he had formerly had with Richardson, and opened a new account in the name of Henry J. Wickart alone. A few days later the Orphans Court for Baltimore City wrote a letter to Wickart inquiring whether there was any inheritance tax due on this transfer. Wickart said that Richardson saw this letter and "got sore," he doesn't remember just what Richardson said to him at that time. Wickart then testified: "He promised to take care of me and to do what was right, he said everything would be different, and I said, 'I have always acted honestly and you have not and no use talking that way,' and he said, 'well, Captain, where [have] I not acted honestly' and he wanted to know, and I said 'one case alone you collected rent from my house $54 which you had no right to, you collected in June and not due until July, and you cannot lie out of that.' He said 'I acknowledge I did wrong but I guarantee I will give you that $54 back and take care of you the balance of your life and treat you right,' I said 'that's pretty heavy demand you make but how can I expect you to live up to it,' and he said, 'I will and my wife will live up to it and everything will be different,' he talked me into it, and I thought, I am alone what am I going to do, and I said, 'I will give you another chance with the understanding you will take care of me and be honest and refund that $54 and be straight with me.'

Then I took him to Annapolis and gave him the land, then I took him to Baltimore and drew the money and gave him the money." Wickart said that he was afraid that Richardson was going to leave and that he would be left alone. Wickart said that it was at Richardson's suggestion that he gave him the $4,300 and the land and that Richardson said: "If you will do that I will guarantee everything will be straight and I will take care of you the balance of your life."

On October 27, 1947, Wickart went to Baltimore and withdrew $4,300 from his account and this was transferred to a new account in the same bank, The Savings Bank of Baltimore, in the name of Edward J. Richardson alone. Wickart then chose a lawyer in Annapolis and went to him and signed a deed transferring a lot to the Richardsons, fronting 50 feet on the water. At the Attorney's suggestion Richardson paid Wickart $25 for his lot. Previously, Wickart had arranged with a surveyor to make the survey. Wickart testified that after the deed was signed and the money given, Richardson "acted like he was boss," collected money that didn't belong to him and put the gasoline pumps out of order and did not attend to his work. Wickart said after the transfers: "They did not act right at all, he did not pay me the $54 back for one thing he acted dilatory and common towards me anything I asked him he would go the opposite way always." Wickart said that he and Richardson argued in March 1948 and Richardson said: " 'Captain, I have you where I want you, and you cannot get me off the place, and you are not going to get rid of me on the will like you did Norman, I am going to take care of that now.' I thought that was a threat to my life and I got scared and I telephoned Mr. Carmack, and I said 'come over I need you badly,' and I explained the whole situation to Mr. Carmack, in connection with running the boat yard after Ted [Richardson] took over." Mr. John J. Carmack, a neighbor, remained with him an hour or so. Wickart stayed in his own home that night. At Wickart's request Carmack

took him to Baltimore the next day to make a new will in favor of Carmack. Several days later Carmack suggested that he buy the property from Wickart, who agreed to a purchase price of $4,000. Carmack paid Wickart $1,000 in cash and executed a mortgage to Wickart for the balance of $3,000. The deed contained a provision that Wickart was to live on the property as long as he lived. With Wickart's consent Carmack ordered the Richardsons off the boat yard property.

Edward J. Richardson testified that he paid $6 a month rent for the two-room shed and later moved over into half of the Captain's house. In June 1946 he rented a separate house from Wickart at $10 a month. As his radio business was not successful, because he could not get radio parts, he sold that business and moved down to the boat yard permanently. At that time he had about $900 in cash and was taking a vacation and intended to go back to brick work in the winter. After Norman Easter left, Wickart did not have any one to help him and he would ask Richardson at various times for help, which Richardson said he always gave him. About the middle of August 1946, after Wickart had been consulting a doctor, he said Wickart offered him the same proposition that Easter had and also offered to make a will leaving everything to him and offered to put his name on the joint bank account. Richardson discussed this with his wife and says he accepted Wickart's proposition. The next morning they went to the lawyer suggested by Wickart and after Wickart had talked to the lawyer for about half an hour, the will was executed. He then went to Baltimore and after the official of the Bank made sure that Wickart knew what he was doing, the bank account was eventually changed to the joint names of Wickart and Richardson, with right of survivorship. After they returned to the boat yard the Captain showed him where he kept his bank book and $500 in bills. Richardson said he then started to work on the place, built a battery shed, put a

roof on the railway engine house, tore down old sheds, and generally cleaned up the place.

Wickart contracted penumonia in September 1946 and was very ill. Richardson and his wife nursed him. Richardson said he collected the rent and attended to the boats and turned over to Wickart the money due him. In the Fall of 1946, with the consent of Wickart, Richardson worked elsewhere and looked after the boats on Saturdays, Sundays, and after hours. During the summer of 1947 Wickart was walking around with canes. Richardson says he attended to practically all of the work at the boat yard and Wickart made no complaint. Richardson collected most of the money and kept the records. Mrs. Louise Richardson, who collected the mail, saw a letter come to Wickart marked "Register of Wills" on the outside. A letter had come the year before when Wickart changed the bank account the first time. Richardson therefore thought that Wickart had changed the bank account again. When he asked Wickart about the letter Wickart denied that he had made the change but let him read the letter. When Richardson found that Wickart had changed the joint bank account back into Wickart's name, he says that he told Wickart he did not want to stay there and work steadily any more, that he had a wife and family and he was going back to his trade because he did not know what Wickart would do next. He said that he told Wickart that he would help him when he could. Richardson says that Wickart told him that he did not want him to quit and that he would put the bank account back as it was before the change. Richardson then told him that he did not know what would stop him from changing it again and that he thought he should go back to his trade. He said he would pay Wickart rent but he was not going to be responsible for the boat yard. Richardson then says that Wickart told him that he would take him to the bank, split the bank account and give him half and would also give him a lot of ground on which to build a house. The next day Wickart turned over to him the $4,300

and later deeded him the lot. At the time of the transfer of the $4,300 Mr. Wickart was questioned by one of the bank officials and made to understand just what he was doing. Wickart also arranged for the surveyor to survey the lot and with the attorney to draw the deed as hereinbefore stated. He said he did not have any difficulty with Wickart and the first time he knew that he wasn't wanted on the property was on February 28th when Carmack came over and gave him orders to get off the place in thirty days. He said that he never made any threats against Wickart, and the Captain did not tell him why he sold the place to Carmack. Richardson had driven a well on the lot at the cost of $225. He denied that he ever caused the gasoline pumps to go out of condition. He said that he and his wife looked after Wickart when he was ill, nursed him and cooked for him. He said the reason Wickart gave him the $4,300 was because it was half of the bank account and he wanted Richardson to have it absolutely. Richardson said Wickart wanted him there to look after the yard. He needed help, and that Wickart gave him orders to be the boss there. Richardson testified also as follows:

"Q. Then you told Capt. Wickart you would be satisfied if he gave you half? A. I did not ask him for that money whatever, that's the way he wanted it, and that's the way he had it put himself.

"Q. You told him if you got one-half, the $4,300, and half of the business you would stay on? A. I did not tell Captain Wickart no such thing.

"Q. Did he not say to you if he gave you a piece of ground would that satisfy you? A. Yes, I said 'I will be tickled to death because I want to build a home so I would like that.'

"Q. He did ask you if you would be satisfied if you would stay if he gave you $4,300 and a lot of ground? A. Yes.

"Q. You told him you would be satisfied and you stayed? A. Yes.

"Q. Took care of the boat yard and looked after Captain? A. I told him, 'Long as you live you have nothing to worry about I will look after you, and you can stay with me as long as you are alive, I will see you through.'

"Q. As a matter of fact, this was not just a gift to you it was just as you described, he gave you $4,300 and you told him you would take care of the boat yard and take care of him. A. It was absolutely a gift."

After Carmack notified Richardson to vacate he wanted to build a house on his lot but his wife would not let him do it because she said "I cannot stand living alongside of those people cursing the way I have to." Richardson testified that he was not allowed by Carmack to walk on the boat yard property, and was not allowed to get a drink of water or go to the toilet. Richardson therefore vacated the place and used the $4,300 to buy another property. When asked whether Wickart told him why he sold the property and changed the will, Richardson replied: "He did not tell me what the cause was. He just said 'I have sold to Carmacks the whole place,' and I said, 'Why did you not sell it to me, you know I have $4,000, you know I could have bought it from you,' and he said, 'you did not ask me,' and I said, 'you always told me you would not sell property to anybody, I am surprised you sold him what you did,' and he said, 'Well, Mr. Carmack is your boss.'"

Mrs. Lillian Louise Richardson, one of the appellants, testified that when Wickart was sick she took care of him every day, washed him and put clean clothes on him and washed his clothes. A number of witnesses who kept boats at the yard testified that Richardson was busy at the boat yard, kept it clean and worked hard there, and that Wickart never complained about Richardson's work.

John J. Carmack testified that when he went to Captain Wickart's house the night that he was called on the telephone his wife went with him. He said at that time the Richardsons were outside Captain Wick-

art's window listening. The next day Mrs. Richardson "called me a few names and told me she was out there listening." He further said that he heard Richardson tell Wickart that he was going to make a pauper out of him and send him to the poor house. He also said that Mrs. Richardson cursed Captain Wickart. Mrs. Richardson, when asked of her telephone conversation with Mrs. Carmack, said "All I told her was I thought it was a dirty trick to play on me. She could have let me know something about it. I said I thought she was a friend of mine instead of an enemy."

After Richardson had removed from the property and bought another place, Captain Wickart sent for him to come to his house. He went there and found some of the Carmacks present. Wickart told him that he would have to give him back the lot of ground and if he did not do it he was going to sue him. Richardson refused to discuss the matter with the Carmacks present, and walked out.

On June 4, 1948, Henry Wickart filed a bill of complaint against Edward J. Richardson and Lillian L. Richardson, his wife, in which he recited in part the facts hereinbefore set forth, and asked among other things that the appellant be required to account to the appellees for the money collected; that a decree be passed declaring the deed from the appellee to the appellants null and void; that the Court pass a monetary decree awarding the appellee the sum of $4,000 procured from the appellant; that the new property purchased by the appellants be impressed with a lien in the amount of $4,000 in favor of the appellee. After answer filed and hearing in open court, the chancellor passed a decree striking down and declaring void the transfer of the $4,300 to Edward J. Richardson; declaring the deed of the lot in question to be null and void; impressing the sum of $136 accruing on the bank account of Edward J. Richardson in the Savings Bank of Baltimore with a trust in favor of the appellee; and decreeing that there is justly due and owing from Richardson to Wickart

the sum of $3,914 and that a lien in that amount be impressed on the new property purchased by Richardson. This amount of $3,914 was arrived at by deducting from the sum $4,300, the $225 paid by appellants for digging the well, the $25 paid for the lot and the $136 impressed with the trust in favor of Wickart. From that decree appellants appeal.

It could hardly be contended in this case that the relationship of principal and agent did not exist between Captain Wickart and Richardson. After the employment of Richardson in August 1946 and certainly after Captain Wickart contracted pneumonia in September 1946 Richardson conducted the boat yard business. In fact, he admitted in his testimony that he was "running the whole thing" and he was the boss because Wickart ordered him to be the boss. Richardson also kept the records and collected practically all of the money. There is no question but that the relation of principal and agent is a confidential one where the agency includes the management of all the business affairs of the principal. There is also no doubt that at the time these gifts were made Wickart was old, lonely, and sick. Therefore, Wickart and Richardson stood in a confidential relationship and the burden was on Richardson to show that the transaction by which he received the $4,300 and the lot of land was fair and that the confidence of Wickart was not abused. *Myers v. Myers,* 185 Md. 210, 216, 44 A. 2d 455; *Brown v. Merchantile Trust & Deposit Co.,* 87 Md. 377, 390, 40 A. 256.

This is a case in which the appearance and demeanor of the parties and witnesses is of great help in reaching a correct solution. It was said by Judge Diggs in the case of *Sporrer v. Ady,* 150 Md. 60, at pages 70 and 71, 132 A. 376, 380: "We have found occasion, in numerous decisions, to enunciate the rule that this Court is loath to reverse the lower court upon a finding of fact unless the evidence clearly demonstrates that such finding was erroneous, for the sufficient reason, often stated, that the chancellor has the benefit of seeing and hearing the

witnesses, observing their manner of testifying and general demeanor; or, in other words, having the benefit of the atmosphere surrounding the trial. In the present case, the testimony having been taken in open court, the chancellor had the benefit of this atmosphere, of which we are denied; and when, on the evidence as disclosed by the record, the question is as close and uncertain as here presented, we will not disturb the lower court's decision." *Garner v. Garner,* 171 Md. 603, 615, 190 A. 243; *Schneider v. Menaquale,* 187 Md. 202, 204, 49 A. 2d 330.

In the case of *Gaggers v. Gibson,* 180 Md. 609, 26 A. 2d 395, a daughter assumed control of her father's affairs. He was eighty-six years old and had been in ill health for more than a year. When his real estate worth $5,500 was threatened with foreclosure of a mortgage in the amount of $1,200, she persuaded her father to deed the property to her future husband in order to save it. This Court finding there was a confidential relation between the parties and affirming the chancellor and setting aside the conveyance, after pointing out that Gibson was eighty-six years of age and very feeble, said, through Judge Forsythe, 180 Md. at page 613, 26 A. 2d at page 397: "The existence of the confidential relation creates a presumption of influence which imposes upon the one receiving the benefit the burden of proving an absence of undue influence by showing that the party acted upon competent and independent advice of another, or such facts as will satisfy the court that the dealing * * * was had in the most perfect good faith on his part and was equitable and just between the parties." See also *Mead v. Gilbert,* 170 Md. 592, 185 A. 668; *Hoffman v. Rickell,* 191 Md. 591, 598, 62 A. 2d 597, 599; *Brandenburg v. Harshman,* 193 Md. 104, 65 A. 2d 906.

The burden of proving that these transfers were not made by undue influence, were in good faith and equitable and just between the parties, being on the appellants, how is that burden met? It is true that while Richardson conducted the boat yard more money was made than

during any other similar period. Although as appellee contends, during that period there was probably more demand for boat work, yet some one had to do the work and Richardson did it or saw that it was done. The appellants in their brief contend "Although Richardson, unlearned in the law and trying to retain what he received, termed the transfers a gift, it is plain from his testimony, as well as his subsequent conduct, that he understood and intended that he had an executory obligation in return, of remaining on the place and helping Wickart for his life time." The testimony in this case does not bear out appellants' contention. Although pressed, as hereinbefore set forth, to answer the question: "As a matter of fact, this was not a gift to you it was just as you described, he gave you $4,300 and you told him you would take care of the boat yard and take care of him," in the affirmative, Richardson characterizes this transfer of one third of the total assets of this old, sickly, lonely, vacillating man of meager means, as "absolutely a gift." Richardson therefore understood by these gifts to him that there was no obligation on him to do what Wickart understood he was legally bound to do, that is, to take care of Wickart as long as he lived. Although Richardson said he told Wickart that he could stay with him as long as he was alive, he did not consider he had an executory obligation. Richardson's actions and those of his wife after the gifts were made are at least questionable. These gifts were not equitable and just between the parties and the decree should be affirmed.

*Decree affirmed, with costs.*